UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re Farmers Insurance FCRA Litigation | Case No. 5:03-cv-158-F |
| | MDL No. 1564 |
| Judge Friot | **This document relates to *Corl*, *Mobbs*, and *Watts*** |

**UNITED STATES' OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT
MOTION,  TO THE EXTENT OF DEFENDING THE CONSTITUTIONALITY
OF STATUTORY DAMAGES UNDER THE FAIR CREDIT REPORTING ACT**

## TABLE OF CONTENTS

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONCISE STATEMENT OF DISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . . 2

STATUTORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Insurers' duties when taking adverse action based upon credit reports. . . . . . . . . 3

II.     Methods available to enforce FCRA's requirements. . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      FCRA is not "void for vagueness" on grounds that it does not identify
        criteria to determine statutory damages within its $100 to $1,000 statutory
        range. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     FCRA's statutory damages provision does not violate due process merely
        because a jury might return a large statutory-damages verdict. . . . . . . . . . . . . . . 11

        A.      It is premature to consider defendants' assertion that a potential
                adverse statutory-damages verdict might be constitutionally
                excessive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Any due-process analysis of FCRA's statutory-damages provision
                would measure proportionality by considering the public interest as
                well as private injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      FCRA statutory damages are not subject to, and in any event do not
                violate, constitutional limitations on jury awards of punitive damages. . . 21

                1.      *Statutory-damage ranges enacted by Congress are not subject*
                        *to the due process tests that courts apply to review jury*
                        *awards of punitive damages*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

       2.     *Even if the standards for reviewing jury punitive-damage awards governed the constitutionality of federal statutes, the Court would still have to consider potential harm as well as actual harm* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       3.     *Due process does not require that substantial statutory-damage awards be supported by proof of "actual harm"* . . . . . . . . 26

   D.    Defendants do not have greater due process rights in class-action cases than in individual party actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

DECLARATION OF DANIEL K. CRANE-HIRSCH IN SUPPORT OF THE UNITED STATES' OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION,  TO THE EXTENT OF DEFENDING THE CONSTITUTIONALITY OF STATUTORY DAMAGES UNDER THE FAIR CREDIT REPORTING ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1.     S. Rep. No. 91-517 (1969)

    2.     115 Cong. Rec. 33,408-12 (1969) (comments of Sens. Proxmire and Williams)

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*Accounting Outsourcing, LLC. v. Verizon Wireless Personal Communications,*
329 F. Supp. 2d 789 (M.D. La. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Arcilla v. Adidas Promotional Retail Operations, Inc.,*
488 F. Supp. 2d 965 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arrez v. Kelly Services, Inc.,*
522 F. Supp. 2d 997 (N.D. Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

*Ashby v. Farmers Insurance Co. of Oregon,*
592 F. Supp. 2d 1307 (D. Or. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Ashwander v. Tennessee Valley Authority,*
297 U.S. 288 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim* from 22

*Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,*
492 U.S. 257 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Califano v. Yamasaki,*
442 U.S. 682 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Centerline Equipment Corp. v. Banner Personal Services, Inc.,*
545 F. Supp. 2d 768 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . 14, 18-19, 25

*Chair King, Inc. v. GTE Mobilnet of Houston, Inc.,*
135 S.W.3d 365 (Tex. App. 2004), *rev'd in part,*
184 S.W.3d 707 (Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chicago v. Morales,*
527 U.S. 41 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Concrete Pipe & Products of California, Inc.*
*v. Construction Laborers Pension Trust for Southern California,*
508 U.S. 602 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Deposit Guaranty National Bank v. Roper,*
    445 U.S. 326 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*DirecTV, Inc. v. Cantu,*
    No. SA-04-CV-136-RF, 2004 WL 2623932 (W.D. Tex. Sept. 29, 2004). . . . . . . 25

*DirecTV, Inc. v. Spillman,*
    No. Civ.A.SA-04-82-XR, 2004 WL 1875045 (W.D. Tex. Aug. 23, 2004). . . . . . 14

*Douglas v. Cunningham,*
    294 U.S. 207 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

*ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.,*
    50 P.3d 844 (Ariz. Ct. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

*Express Valet, Inc. v. City of Chicago,*
    869 N.E.2d 964 (Ill. App. Ct. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*F.W. Woolworth Co. v. Contemporary Arts,*
    344 U.S. 228 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gore v. United States,*
    357 U.S. 386 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Grimes v. Rave Motion Pictures of Birmingham, LLC,*
    552 F. Supp. 2d 1302 (N.D. Ala. 2008),
    *vacated sub nom. Harris v. Mexican Specialty Foods, Inc.,*
    ___ F.3d ___ , Nos. 08-13510 & 08-13616, 2009 WL 944201,
    2009 U.S. App. LEXIS 7681 (11th Cir. Apr. 9, 2009). . . . . . . . . . . . . . . . . 1, 8, 9

*Harjoe v. Herz Financial,*
    108 S.W.3d 653 (Mo. 2003) (*per curiam*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Harris v. Mexican Specialty Foods, Inc.,*
    ___ F.3d ___, 2009 WL 944201, 2009 U.S. App. LEXIS 7681
    (11th Cir. Apr. 9, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim* from 7

*Hill v. Colorado,*
    530 U.S. 703 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Farmers Insurance Co. FCRA Litigation*,
    No. CIV-03-158-F, MDL 1564,
    2006 WL 1042450 (W.D. Okla. Apr. 13, 2006) . . . . . . . . . . . .   6, *passim* from 19

*In re Farmers Insurance Co. FCRA Litigation*,
    No. CIV-03-158-F, MDL 1564,
    2008 WL 687085 (W.D. Okla. Mar. 10, 2008) . . . . . . . . . . . . . . . . . . . . . . 1, 3, 11

*In re Marriage of Chen & Ulner*,
    820 N.E.2d 1136 (Ill. App. Ct. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Irvine v. 233 Skydeck, LLC*,
    597 F. Supp. 2d 799 (N.D. Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

*Italia Foods, Inc v. Marinov Enterprises, Inc.*,
    No. 07-C-2494, 2007 WL 4117626 (N.D. Ill. Nov. 16, 2007) . . . . . . . . . . . . . . 25

*Kaufman v. ACS Systems, Inc.*,
    2 Cal. Rptr. 3d 296 (Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

*Kavu, Inc. v. Omnipak Corp.*,
    246 F.R.D. 642 (W.D. Wash. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Kenro, Inc. v. Fax Daily, Inc.*,
    962 F. Supp. 1162 (S.D. Ind. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Klingensmith v. Max & Erma's Restaurants, Inc.*,
    No. 07-C-0318, 2007 WL 3118505 (W.D. Pa. Oct. 23, 2007) . . . . . . . . . . . . . . 14

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    302 F. Supp. 2d 455 (D. Md. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

*Madoux v. City of Norman*,
    No. CIV-07-0435-F, 2008 WL 619360 (W.D. Okla. Feb. 28, 2008). . . . . . . . . . . 29

*Murray v. GMAC Mortgage Corp.*,
    434 F.3d 948 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 26

*Native American Arts, Inc. v. Bundy-Howard, Inc.*,
    168 F. Supp. 2d 905 (N.D. Ill. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pacific Mutual Life Insurance Co. v. Haslip*,
    499 U.S. 1 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Parker v. Time Warner Entertainment Co.*,
    331 F.3d 13 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Peer International Corp. v. Pausa Records, Inc.*,
    909 F.2d 1332 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Phillips Randolph Enterprises, LLC v. Rice Fields*,
    No. 06-C-4968, 2007 WL 129052 (N.D. Ill. Jan. 11, 2007). . . . . . . . . . . . . . . . 25

*Pirian v. In-N-Out Burgers*,
    No. SACV-06-1251 DOC (MLGx),
    2007 WL 1040864 (C.D. Cal. Apr. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ramirez v. Midwest Airlines, Inc.*,
    537 F. Supp. 2d 1161 (D. Kan. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

*Ratner v. Chemical Bank New York Trust Co.*,
    54 F.R.D. 412 (S.D.N.Y. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*Roe No. 2 v. Ogden*,
    253 F.3d 1225 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sadowski v. Medical1 Online, LLC*,
    No. 07-C-2973, 2008 WL 489360 (N.D. Ill. Feb. 20, 2008). . . . . . . . . . . . . . . 25

*Safeco Insurance Co. of America v. Burr*,
    551 U.S. 47, 127 S. Ct. 2201 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Scofield v. Telecable of Overland Park, Inc.*,
    751 F. Supp. 1499 (D. Kan. 1990),
    *rev'd in part*, 973 F.2d 874 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Six Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Smith v. Casino Ice Cream, LLC*,
   No. 08-61285-CIV, 2008 WL 4541013,
   2008 U.S. Dist. LEXIS 81550 (S.D. Fla. Oct. 9, 2008) . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. MSV Sales & Services, LLC*,
   No. 08-61436-CIV, 2008 WL 4921356,
   2008 U.S. Dist. LEXIS 93996 (S.D. Fla. Nov. 17, 2008) . . . . . . . . . . . . . . . . . . 11

*Solem v. Helm*,
   463 U.S. 277 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Soprych v. T.D. Dairy Queen, Inc.*,
   No. 08-cv-02694, 2009 WL 498535,
   2009 U.S. Dist. LEXIS 15286 (N.D. Ill. Feb. 26, 2009) . . . . . . . . . . . . . 11, 13, 19

*Spector Motor Serv. v. McLaughlin*,
   323 U.S. 101 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*St. Louis, Iron Mountain & Southern Railway Co. v. Williams*,
   251 U.S. 63 (1919). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim* from page 14

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
   538 U.S. 408 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 26

*TXO Production Co. v. Alliance Resources Corp.*,
   509 U.S. 443 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*Texas v. American Blastfax, Inc.*,
   121 F. Supp. 2d 1085 (W.D. Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Texas v. United States*,
   523 U.S. 296 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Turner Broadcasting System, Inc. v. FCC*,
   520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
   488 F. Supp. 2d 719 (N.D. Ill. 2007),
   *appeals dismissed per stipulation*,
   Nos. 07-2111 & 07-2113 (7th Cir. Sept. 12, 2008). . . . . . . . . . . . . . . . . . . . 20, 24

*United States v. Bajakajian*,
    524 U.S. 321 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Batchelder*,
    442 U.S. 114 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 23

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*White v. E-Loan*,
    No. C 05-02080 SI, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006). . . . . . . . . . . 19

*Wilcox v. Commerce Bank of Kansas City*,
    474 F.2d 336 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Zomba Enterprises, Inc.* v. *Panorama Records, Inc.*,
    491 F.3d 574 (6th Cir. 2007), *reh'g en banc denied*,
    Nos. 06-5013 & 06-5266 (6th Cir. Oct. 5, 2007),
    *cert. denied*, 553 U.S. ___, 128 S. Ct. 2429 (2008). . . . . . . . . . . . . . . . . . . 20, 23, 24

## STATUTES

15 U.S.C. § 1117(a) (Anticybersquatting Consumer Protection Act). . . . . . . . . . . . . . . . 11

15 U.S.C. § 1117(c) (Anti-Counterfeiting Consumer Protection Act of 1996). . . . . . . . . 11

15 U.S.C. § 1117(d) (Anticybersquatting Consumer Protection Act). . . . . . . . . . . . . . . . 11

15 U.S.C. §§ 1681-1681v (Fair Credit Reporting Act). . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    15 U.S.C. § 1681. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    15 U.S.C. § 1681(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    15 U.S.C. §§ 1681m-1681n. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    15 U.S.C. § 1681m. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    15 U.S.C. § 1681m(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 11

    15 U.S.C. § 1681m(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 1681n-1681p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. § 1681n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

15 U.S.C. § 1681n(1)-(2) (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. § 1681n(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. § 1681n(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14, 23, 30

15 U.S.C. § 1681*o* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. § 1681s(a)-(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17 U.S.C. § 504(c) (Copyright Act). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

17 U.S.C. § 1203(c)(2) (Digital Millennium Copyright Act). . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2318(f)(4)
    (Intellectual Property Protection and Courts Amendments Act of 2004). . . . . . . . 10

18 U.S.C. § 2520(b)(2), (c)(1)(A)
    (Electronic Communications Privacy Act of 1986). . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 2403(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

35 U.S.C. § 297(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 605(e)(3)(B)(iii), (e)(3)(C)(i)(II), (e)(3)(C)(ii)
    (Cable Communications Policy Act of 1984)  . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 227(b)(3)(B) (Telephone Consumer Protection Act (TCPA)). . . 14, 18, 19, 24

Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208,
    secs. 2401-2422, 110 Stat. 3009-426. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

**RULES**

Fed. R. Civ. P. 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

LCvR56.1(b) (W.D. Okla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## OTHER AUTHORITIES

115 Cong. Rec. 33,408-09 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

S. Rep. No. 91-517 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17

*Black's Law Dictionary* (8th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## INTRODUCTION

The Fair Credit Reporting Act (FCRA) requires defendants to notify their policy-holders if they raise the policy-holders' premiums because of negative information in the policy-holders' credit reports.  This Court has already determined that defendants' disclosure notice fell short of FCRA's requirements.  *In re Farmers Ins. Co. FCRA Litigation*, No. CIV-03-158-F, MDL 1564, 2008 WL 687085, at *1 (W.D. Okla. Mar. 10, 2008) ("*In re Farmers* March 2008 decision").  If defendants are found at trial to have violated FCRA's requirements "willfully," they would be liable for $100 to $1,000 in statutory damages per violation.  Defendants are challenging FCRA's statutory-damages provision on multiple constitutional grounds.  Relying primarily upon a district court decision that the Eleventh Circuit vacated on appeal,[1] they claim that FCRA's $100 to $1,000 range of statutory damages is unconstitutionally "vague" under the Due Process clause; that the possibility that they might be found liable and be subjected to a large judgment renders the statute unconstitutionally excessive, again in violation of the Due Process clause; and that, even though statutory damages do not require pleading or proving actual damages, anything larger than the minimum possible statutory damages would be unconstitutional unless plaintiffs plead and prove actual individual losses.

The Court authorized the United States of America to intervene to defend the constitutionality of the challenged statute under 28 U.S.C. § 2403(a).  We argue here that

---

[1] *Grimes v. Rave Motion Pictures of Birmingham, LLC*, 552 F. Supp. 2d 1302 (N.D. Ala. 2008), *vacated sub nom. Harris v. Mexican Specialty Foods, Inc.*, ___ F.3d ____, Nos. 08-13510 & 08-13616, 2009 WL 944201, 2009 U.S. App. LEXIS 7681 (11th Cir. Apr. 9, 2009).

the Constitution does not require statutes to identify criteria for fact-finders to apply in

imposing a criminal sentence, much less in setting civil damages; and that it is premature

for the Court to decide whether a potential statutory-damages verdict might be

constitutionally excessive, and in any event, FCRA's range of statutory damages

withstands due-process scrutiny.

## CONCISE STATEMENT OF DISPUTED MATERIAL FACTS

In their brief, defendants assert—without citation—that:

• There is a "complete absence of any evidence of actual harm to Plaintiffs or class members," Defs.' SJ Br. 39;

• "Plaintiffs do not intend to introduce evidence of *any* actual harm to any class member," *id.* at 41;

• "Plaintiffs have no evidence of actual harm," *id.* at 41 n.24; and

• "Each of the named Plaintiffs (and presumably all future class members) disavows any evidence of actual harm or injury due to Farmers' alleged FCRA notice violation," *id.* at 45.

Contrary to LCvR56.1(b) (W.D. Okla. 2008), Defendants did not include these

factual assertions in their Statement of Undisputed Material Facts, Defs.' SJ Br. 4-12.

The one pertinent portion of their Statement is lettered "F," which asserts in relevant part:

The named Plaintiffs have not offered any evidence that they or any putative class members were actually injured or harmed in any way as a result of the FCRA notice.  Indeed, Plaintiffs have disavowed any obligation to provide such evidence in support of their claims.  (*See, e.g.,* Pltfs. Resp. to Defs. Class Motion at 32-35 (Doc. No. 928).)

*Id.* at 11-12.  But before summary judgment, there are rarely mechanisms for parties to

"offer[] any evidence" at all (of actual injury or anything else).  Plaintiffs' not yet offering

2

such evidence (if true) hardly demonstrates that they lack such evidence, as Defendants assert without citation. *Id.* at 41 n.24. More importantly, what plaintiffs apparently actually "disavowed"—any *obligation* to provide evidence of actual injury or harm, Defs.' SJ Br. at 12—bears little relation to defendants' later assertion that plaintiffs "disavow[] any *evidence* of actual harm or injury," *id.* at 45 (emphasis added).

In addition, it appears from defendants' own brief that they charged at least one named plaintiff, Nyle Cearlock, higher premiums based upon erroneous credit-report information. *Id.* at 17-18 (citing Cearlock Dep. at 31-34). Mr. Cearlock's premium increase is among those that the Court has found defendants did not disclose adequately as adverse actions based upon consumer credit information. *In re Farmers* March 2008 decision, 2008 WL 687085, at *1. Even assuming evidence of actual harm were required to obtain statutory damages, it appears that plaintiffs have such evidence.

## STATUTORY BACKGROUND

Originally enacted in 1970, FCRA has been amended several times. We first summarize the pertinent duties of insurers using credit reports; and then enforcement measures.

### I.   INSURERS' DUTIES WHEN TAKING ADVERSE ACTION BASED UPON CREDIT REPORTS

Congress enacted the Fair Credit Reporting Act in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, ___, 127 S. Ct. 2201, 2205-06 (2007) (citing 15 U.S.C. § 1681 (Congressional findings and statement of purpose)). In

general terms, FCRA seeks to protect "the confidentiality, accuracy, relevancy, and proper utilization" of consumer credit, personnel, insurance, and other consumer information.  15 U.S.C. § 1681(b).  Toward those ends, FCRA regulates the contents, dissemination, and use of consumer reports; gives consumers the right to review the contents of their files and dispute information believed to be inaccurate; and provides consumers with notice when adverse actions are taken on the basis of their consumer reports.

The purpose of FCRA, as further elaborated in its legislative history, is "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report."  S. Rep. No. 91-517, at 1 (1969) (copy attached as Ex. 1).  The statute was designed to address "the inability at times of the consumer to know he is being damaged by an adverse credit report. . . .  Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story."  *Id*. at 3.  As Senator William Proxmire explained when the Senate first passed FCRA, "[f]ew individuals realize that these credit [reporting] files are in existence.  However, such a file can have a serious effect on whether a man gets employment or insurance."  115 Cong. Rec. 33,408-09 (1969) (copy attached as Ex. 2).

The FCRA provision that plaintiffs allege defendants violated, requiring credit-report users to notify consumers of adverse actions, is codified at 15 U.S.C. § 1681m(a).  In 1996, Congress amended this and many other portions of FCRA to increase consumer

4

privacy and enhance the accuracy of credit reporting. Consumer Credit Reporting Reform Act of 1996 ("Reform Act"), Pub. L. No. 104-208, secs. 2401-2422, 110 Stat. 3009-426 to 3009-454 (codified as amended at 15 U.S.C. §§ 1681-1681v). As amended by the Reform Act, § 1681m(a) provides, "If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—(1) provide oral, written, or electronic notice of the adverse action to the consumer . . . ."

## II.   METHODS AVAILABLE TO ENFORCE FCRA'S REQUIREMENTS

FCRA is subject to enforcement by several federal agencies, chief among them the Federal Trade Commission, as well as by State Attorneys General. *See* 15 U.S.C. § 1681s(a)-(c). In addition, FCRA authorizes consumers to bring private suits for violations of the Act and its implementing regulations. *Id.* §§ 1681n-1681p. Section 1681n prescribes private remedies for willful violations, while § 1681*o* specifies private remedies for negligent violations.

As originally enacted in 1970, FCRA enabled consumers to recover two kinds of damages for willful violations: actual damages and punitive damages. 15 U.S.C. § 1681n(1)-(2) (1970). The Reform Act of 1996 amended § 1681n to provide the additional remedy of statutory damages. Pub. L. No. 104-208, § 2412(a)-(c), 110 Stat. 3009-426, 3009-446 (codified at 15 U.S.C. § 1681n(a)). In its amended form, § 1681n(a) provides:

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

    (1) (A) any actual damages sustained by the consumer as a result of the failure *or damages of not less than $100 and not more than $1,000*; or

        (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

    (2) such amount of punitive damages as the court may allow; and

    (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a)(1)-(3) (emphasis added).  A plaintiff may obtain either actual damages or statutory damages, and, as this Court has already held, "the recovery of statutory damages under the FCRA is not dependent on proof of injury or harm."  *In re Farmers Ins. Co. FCRA Litig.*, No. CIV-03-158-F, MDL 1564, 2006 WL 1042450, at *9 (W.D. Okla. Apr. 13, 2006) ("*In re Farmers* April 2006 decision").

## **ARGUMENT**

I.    **FCRA IS NOT "VOID FOR VAGUENESS" ON GROUNDS THAT IT DOES NOT IDENTIFY CRITERIA TO DETERMINE STATUTORY DAMAGES WITHIN ITS $100 TO $1,000 STATUTORY RANGE**

Defendants' first constitutional argument is that FCRA's statutory-damages provision is "void for vagueness" on grounds that it does not guide a court or jury on how to set damages *within* its statutory range of $100 to $1,000 per willful violation.  Defs.' SJ Br. 35-39.  A statute can be unconstitutionally vague for either of two reasons:  First, if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; and second, if it "authorizes or even encourages arbitrary and

discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)).

While vagueness doctrine ensures that people can know what the law requires well enough to comply, it has never been held to require that someone intent upon *breaking* the law must be able to calculate precisely what his or her sanction will be.  The Supreme Court's indeterminate-sentencing decisions dispose of defendants' vagueness arguments. In *United States v. Batchelder*, 442 U.S. 114 (1979), the Court rejected a vagueness challenge based upon two federal criminal statutes that prescribed different penalty ranges for the same criminal conduct.  The defendant argued that, read together, the statutes were void for vagueness because they did not provide adequate notice of the penalties to which he was exposed.  The Court concluded that although violators could not know which statute they would be charged with violating, and thus could not know in advance the maximum penalty that would be imposed, "[s]o long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *Id.* at 123.  The Eleventh Circuit recently applied this Supreme-Court precedent to a void-for-vagueness challenge against FCRA's statutory-damages provision, and held that FCRA "gives potential defendants notice that if they violate [the statute], they will be subject to penalties of $100 to $1,000 per violation.  We therefore conclude that the statute satisfies due process by giving sufficient notice to potential violators." *Harris v. Mexican Specialty Foods, Inc.*, ___

F.3d _____, Nos. 08-13510 & 08-13616, 2009 WL 944201, at *7, 2009 U.S. App. LEXIS 7681 (11th Cir. Apr. 9, 2009).[2]

Indeed, notice concerns have even less resonance here than in *Batchelder*, because "[i]t is by now well settled that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 637 (1993) (internal quotation marks and citations omitted). Thus, "economic regulation is subject to a less strict vagueness test" than other legislation. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).[3]

FCRA is far from alone in prescribing a range of statutory damages without specifying criteria to determine damages within its statutory range. Most notably, the Copyright Act authorizes statutory damages of $750 to $150,000 per willfully infringed

---

[2] *Harris* is the decision that vacated the *Grimes* district court decision, *Grimes v. Rave Motion Pictures of Birmingham, LLC*, 552 F. Supp. 2d 1302 (N.D. Ala. 2008), on which Defendants rely.

[3] Defendants seek to distinguish *Hoffman Estates* on grounds that FCRA leaves "businesses . . . without any guidance" in deciding whether to obey the law, or willfully violate it, because they will be uncertain how much they might have to pay if they willfully violate the law and get caught. Def.'s SJ Br. at 37 n.20. Not only was the same argument considered and rejected in *Batchelder*, 442 U.S. at 123 (finding no constitutional infirmity due to defendants' "uncertainty as to which crime may be charged and therefore what penalties may be imposed"), but *Hoffman Estates* emphasized that there is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates*, 455 U.S. at 498-99.

work, 17 U.S.C. § 504(c), and yet the Supreme Court has held that an award within the

Copyright Act's statutory range could not be an abuse of discretion, *Douglas v.*

*Cunningham*, 294 U.S. 207, 210 (1935).  As the Eleventh Circuit pointed out when it

vacated *Grimes*, when the Supreme Court addressed the Copyright Act's

statutory-damages provision in 1998, it "noted that statutory-damages ranges have been

utilized throughout American history.  *See Feltner v. Columbia Pictures Television, Inc.*,

523 U.S. 340, 351 (1998) (noting that 'three of the state [copyright] statutes [predating

the Constitution] specifically authorized an award of damages from a statutory range, just

as § 504(c) does today')."  *Harris*, 2009 WL 944201, at *6 n.7.

Defendants observe that in some consumer-protection statutes, Congress did

specify factors for fact-finders to consider in setting damages within a statutory range.

Defs.' SJ Br. 36.  But Congress's choosing to provide such guidance in some statutes

hardly means that the Due Process Clause requires it to do so in every statute.  If

accepted, defendants' void-for-vagueness principle would require overturning numerous

statutes, beginning with the Copyright Act:

- Copyright Act, 17 U.S.C. § 504(c) (actual damages, or statutory damages of $750 to $30,000 per infringed work, and up to $150,000 per willfully infringed work).

- Intellectual Property Protection and Courts Amendments Act of 2004, 18 U.S.C. § 2318(f)(4) (actual damages and profits, or at election of copyright owner, statutory damages of $2,500 to $25,000 "as the court considers appropriate").[4]

---

[4] A statute's calling for a court to impose an "appropriate" or "just" award within a statutory range presumably does not supply the statutory criteria that Defendants assert are required by the Due Process Clause.

- Anti-Counterfeiting Consumer Protection Act of 1996, 15 U.S.C. § 1117(a), (c) (actual damages and profits, or at election of plaintiff, statutory damages of $500 to $100,000 per counterfeit mark "as the court considers just," and up to *$1 million* per counterfeit mark for willful violations "as the court considers just").

- Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1117(a), (d) (actual damages and profits, or at election of plaintiff, statutory damages of $1,000 to $100,000 per domain name, "as the court considers just").

- Digital Millennium Copyright Act, 17 U.S.C. § 1203(c)(2)-(c)(3) (actual damages and profits, or at election of complaining party, statutory damages of $200 to $2,500 per violation "as the court considers just").

- Fraudulent conduct by invention promoter, 35 U.S.C. § 297(b)(1)(B) (actual damages, or statutory damages up to $5,000 "as the court considers just").

- Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2520(b)(2), (c)(1)(A) (actual damages, or statutory damages of $50 to $500, "and punitive damages in appropriate cases").

- Cable Communications Policy Act of 1984, 47 U.S.C. § 605(e)(3)(B)(iii), (e)(3)(C)(i)(II), (e)(3)(C)(ii) (actual damages and profits, or statutory damages of $1,000 to $10,000 "as the court considers just," plus if "the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation").

Defendants imply that when Congress enacts a range of statutory damages from $100 to $1,000 for willful violations (far less than the range from $750 to $150,000 under the Copyright Act, or the range from $500 to $1 million under the Anti-Counterfeiting Consumer Protection Act), the Due Process Clause requires it to specify "criteria [that] a jury [is] to consider in deciding whether to award $100, $1,000, or some amount between the two." Defs.' SJ Br. 38. But "statutory damages ranges like that enumerated in [FCRA] are commonplace and courts routinely uphold them." *Irvine v. 233 Skydeck,*

10

*LLC*, 597 F. Supp. 2d 799, 803 (N.D. Ill. 2009). This Court should join the numerous

other courts to reject void-for-vagueness challenges against FCRA's statutory-damages

provision. *Harris*, 2009 WL 944201, at *6-*7; *Irvine*, 597 F. Supp. 2d at 803; *Ashby v.*

*Farmers Ins. Co. of Or.*, 592 F. Supp. 2d 1307, 1314-15 (D. Or. 2008); *Soprych v. T.D.*

*Dairy Queen, Inc.*, No. 08-cv-02694, 2009 WL 498535, at *1, 2009 U.S. Dist. LEXIS

15286 (N.D. Ill. Feb. 26, 2009); *Smith v. Casino Ice Cream, LLC*, No. 08-61285-CIV,

2008 WL 4541013, at *2, 2008 U.S. Dist. LEXIS 81550 (S.D. Fla. Oct. 9, 2008); *Smith v.*

*MSV Sales & Servs., LLC*, No. 08-61436-CIV, 2008 WL 4921356, at *2, 2008 U.S. Dist.

LEXIS 93996 (S.D. Fla. Nov. 17, 2008). The Constitution requires Congress to write

statutes, not jury instructions.

## II.   FCRA'S STATUTORY DAMAGES PROVISION DOES NOT VIOLATE DUE PROCESS MERELY BECAUSE A JURY MIGHT RETURN A LARGE STATUTORY-DAMAGES VERDICT

### A.   It is premature to consider defendants' assertion that a potential adverse statutory-damages verdict might be constitutionally excessive

"If there is one doctrine more deeply rooted than any other in the process of

constitutional adjudication, it is that [courts] ought not to pass on questions of

constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v.*

*McLaughlin*, 323 U.S. 101, 105 (1944). As this Court has previously held, "[t]here must

be a determination . . . whether the § 1681m(a) violation was negligent or willful," and

"[t]he determination of the ultimate issue of willfulness . . . will involve at least some

matters triable as of right to a jury." *In re Farmers* March 2008 decision, slip op. at ¶¶ 2,

7, 2008 WL 687085, at *1, *2. Whether defendants may be found liable for any damages

is speculative, making it premature for the Court to weigh whether defendants' potential liability for statutory damages might exceed constitutional limits. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

General principles of ripeness, beyond those specific to constitutional adjudication, also counsel against entertaining defendants' challenge to the potential sanctions they may face. In *Texas v. United States*, 523 U.S. 296 (1998), the State of Texas sought a declaration that the Voting Rights Act of 1965 would not require U.S. Justice Department pre-clearance before the State imposed certain sanctions authorized by State law on failing school districts, such as having State-appointed officials take over the functions of locally-elected school boards. In a unanimous decision, the Supreme Court held that Texas's challenge to the potential application of the Voting Rights Act's pre-clearance provision was "not ripe for adjudication [because] it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*, 523 U.S. at 300 (internal quotation marks and citations omitted). A facial constitutional challenge against a statute is a claim "that it always operates unconstitutionally," *Black's Law Dictionary* 244 (8th ed. 2004), and, as a purely legal claim, is presumptively ripe for judicial review because it does not require a developed factual record, *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1232 (10th Cir. 2001). But defendants acknowledge that their excessiveness challenge to FCRA's statutory-damages provision is an as-applied challenge, based upon "the size of the potential class in this case and the [disputed] evidence of actual harm to Plaintiffs or class members." Defs.' SJ Br. 39. Defendants' as-applied challenge

(especially where based upon "potential" factors and disputed evidence) to the size of a potential future verdict is not ripe.

For both reasons—avoiding unnecessary constitutional adjudications, and avoiding declaratory adjudications about speculative events that may not occur at all—defendants' constitutional excessiveness challenge is premature and cannot properly be considered until after an actual statutory-damages jury verdict is returned, if one is. *Harris*, 2009 WL 944201, at *5 (holding that defendants' excessiveness challenge to FCRA statutory damages in a class-action case "is not ripe. At this stage in the proceedings it is impossible to know whether the classes will be certified, how many individuals will be included in each class, whether they will prove willfulness, and the size of the ultimate verdicts.").[5] Numerous other courts concur with the Eleventh Circuit in refusing to consider premature due-process challenges to the size of potential FCRA statutory-damage awards.[6]

---

[5] Defendants attempt to distinguish *Harris* on grounds that this Court has certified a class and that plaintiffs purportedly "have no evidence of actual harm." Defs.' SJ Br. 40-41 n.24. (The latter assertion is made without citation, in violation of this Court's local rules, and appears disputed. *See* pages 2-3, *supra*.) But defendants cannot escape from the fact that they are asking this Court to adjudicate a constitutional claim based on speculation that the jury will find that they acted willfully and will return large verdicts against them.

[6] *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006); *Ashby*, 592 F. Supp. 2d at 1316 ("Defendants' due-process challenge to the constitutionality of a FCRA class action in this case based on the potential for an excessive verdict is, at best, premature and must await the jury's decision."); *Soprych*, 2009 WL 498535, at *1 ("it would be premature to dismiss the complaint based on the potential for a constitutionally excessive damages award"); *Irvine*, 597 F. Supp. 2d at 804; *Ramirez v. Midwest Airlines, Inc.*, 537 F. Supp. 2d 1161, 1169 (D. Kan. 2008) ("where there is not yet any damage award for the court to review . . . Midwest's due process argument is premature"); *Arcilla*

## B.   Any due-process analysis of FCRA's statutory-damages provision would measure proportionality by considering the public interest as well as private injury

Defendants claim that if they are found liable for willfully violating the law, even the smallest possible statutory-damage verdict under FCRA would be unconstitutionally excessive under *St. Louis, Iron Mountain & Southern Railway Co. v. Williams*, 251 U.S. 63 (1919), and similar decisions.  Defs.' SJ Br. 39-44.  *Williams* addressed civil penalties, rather than statutory damages, so it is doubtful that its due-process standards directly apply.[7]  But as we now show, even assuming *Williams*' standards did apply, § 1681n(a)(1)(A) would readily pass muster.

_____

*v. Adidas Promotional Retail Operations, Inc.*, 488 F. Supp. 2d 965, 973 (C.D. Cal. 2007); *Pirian v. In-N-Out Burgers*, No. SACV-06-1251 DOC (MLGx), 2007 WL 1040864, at *5 (C.D. Cal. Apr. 5, 2007) ("constitutional guidelines regarding the excessiveness of a damage award cannot be properly applied before the amount of damages has been determined"); *Klingensmith v. Max & Erma's Rests., Inc.*, No. 07-C-0318, 2007 WL 3118505, at *3 (W.D. Pa. Oct. 23, 2007) ("concerns regarding the disproportionality and/or unconstitutionality of an award are more appropriately reserved until after class certification and trial/resolution").

Courts have similarly refused to consider pre-verdict constitutional excessiveness challenges to potential statutory damages under several other statutes.  *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 777-78 (N.D. Ill. 2008) ($500 mandatory statutory damages for sending unsolicited faxes in violation of Telephone Consumer Protection Ac, 47 U.S.C. § 227(b)(3)(B) (TCPA)); *Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997, 1008 (N.D. Ill. 2007) (statutory damages under state law for failure to pay earned vacation and holiday pay); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 650-51 (W.D. Wash. 2007) (TCPA); *Kaufman v. ACS Sys., Inc.*, 2 Cal. Rptr. 3d 296, 325 (Ct. App. 2003) (TCPA); *DirecTV, Inc. v. Spillman*, No. Civ.A.SA-04-82-XR, 2004 WL 1875045, at *4 (W.D. Tex. Aug. 23, 2004) (statutory damages under state law for pirating satellite TV signals).

[7] *But see Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989) (citing *Williams*, in dicta, as "some authority . . . for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme").

In *Williams*, an Arkansas statute provided that a railroad passenger who was overcharged could sue the railroad to recover a statutory penalty of $50 to $300 per violation.  Two passengers, each overcharged by 66 cents, brought suit and recovered $75.  The railroad challenged the award as impermissibly excessive under the Due Process Clause.  The Supreme Court characterized the statute as "essentially penal, because primarily intended to punish the carrier for taking more than the prescribed rate." *Williams*, 251 U.S. at 66.  It held that while the Due Process Clause limits "the power of the states to prescribe penalties for violations of their laws, . . . the states still possess a wide latitude of discretion in the matter," and "their enactments transcend the limitation only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.* at 66-67.

The Court held that the Arkansas penalty was permissible under this standard "[w]hen it is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates." *Id.* at 67.  The Court acknowledged that "[w]hen the penalty is contrasted with the overcharge possible in any instance it of course seems large, but . . . its validity is not to be tested that way"—*i.e.*, not by comparing it to the actual private injury in any individual case. *Id.*  Instead, "the Legislature may adjust its amount to the public wrong rather than the private injury." *Id.* at 66.

Defendants suggest two reasons that a hypothetical minimum award of statutory damages in this case would be unconstitutionally excessive under *Williams* and its

progeny.  The first reason is based on defendants' assertions that plaintiffs "do not intend to introduce evidence of any actual harm to any class member" and "have no evidence of actual harm."  Defs.' SJ Br. at 41 & n.24.[8]  But *Williams* explicitly provides that the excessiveness inquiry looks to "the public wrong rather than the private injury," and that "the validity [of the award] is not to be tested" by measuring it against "the overcharge possible in any instance."  *Williams*, 251 U.S. at 67.  Instead, the three considerations that mattered were "the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates." *Id.* at 66.

These three *Williams* factors indicate no constitutional excessiveness for FCRA statutory-damages against insurers that fail to give consumers the notifications Congress required when they take adverse action based upon their consumers' credit reports.  First, "the interests of the public" here are at least as consequential as they were in *Williams*. As explained above, FCRA's adverse-notification requirements are intended "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report."  S. Rep. No. 91-517, at 1 (1969) (copy attached as Ex. 1).  Being notified both of the adverse action, and that the adverse action is based on a credit report, is absolutely essential; "[u]nless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story."  *Id*. at 3.  There is a strong public

---

[8] As discussed earlier, defendants cite nothing to support these factual assertions, in violation of local rule, and the assertions appear disputed.  *See* pages 2-3, *supra*.

interest in requiring that when credit-report users base adverse actions against consumers, they must adequately disclose both the adverse action and that it is based upon credit-report information that may be "inaccurate or arbitrary." *Id.* at 1. (Mr. Cearlock's evidence appears a case in point.) The courts owe strong deference to Congress's determination that $100 to $1,000 is the appropriate statutory damage range for users of credit reports who violate the requirements of the Fair Credit Reporting Act. In *Williams*, where the Supreme Court upheld civil penalties imposed under a statutory range of $50 to $300 per violation, the Court stressed that although such awards are subject to the Due Process Clause, legislatures "possess a wide latitude of discretion in the matter." *Williams*, 251 U.S. at 66. *See also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) ("Even in the realm of First Amendment questions . . . deference must be accorded to [Congress's] findings as to the harm to be avoided and to the remedial measures adopted for that end."); *cf. Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 20 (1991) ("As long as the discretion [allowed to juries in imposing punitive-damage awards] is exercised within reasonable constraints, due process is satisfied.").[9]

---

[9] Caselaw under the analogous requirements of the Excessive Fines Clause of the Eighth Amendment confirms the deference owed to Congress. In *United States v. Bajakajian*, the Supreme Court held that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." 524 U.S. 321, 336 (1998) (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983) ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); *Gore v. United States*, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, . . . these are peculiarly questions of legislative policy.")).

Under the second *Williams* factor, the "opportunities for committing the offense" are just as "numberless" here as they were in *Williams*; the willful failure of an insurer to meet its obligations under FCRA can result in the uncorrected use of thousands or even millions of negative credit reports. And under the third *Williams* factor, the need to "secur[e] uniform adherence" to FCRA's adverse-action notification requirements is surely as great as the need to secure uniform adherence to railroad passenger tariffs in *Williams*. Under these circumstances, the minimum statutory award of $100 cannot possibly be dismissed as "wholly disproportioned to the offense."

The second reason that defendants imply a hypothetical statutory-damage award would be unconstitutionally excessive is that it would be large. *See, e.g.*, Defs.' SJ Br. 37 n.22 ("The original class definition in this case resulted in a potential class of nearly 3 million insureds, resulting in a statutory damages range of $300 million to $3 *billion*. Either end of that range has the potential to annihilate even large companies."). Defendants' suggested due-process reasoning amounts to a rule that statutory damages must make lawbreaking affordable. That is, at the least, not self-evident.[10]

---

[10] As the Supreme Court has said, "a rule of liability which merely takes away the profits from [a copyright violation] would offer little discouragement to infringers. . . . The statutory rule, formulated after long experience, . . . is designed to discourage wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952). Contrary to defendants' suggestion, the Due Process Clause "does not require Congress to make illegal behavior affordable, particularly for multiple violations." *Centerline Equip.*, 545 F. Supp. 2d. at 778 (internal quotation marks and citation omitted) (TCPA statutory damages).

 This Court ruled similarly when it certified the class over Defendants' objections:
  [T]he potential for large damages is due to the size of the class . . . [which]
  is essentially a function of the scale of the defendants' insurance business.
  [Refusing to certify a class], due to the large number of affected individuals,

18

In any event, if the size of a potential statutory-damages verdict in this case does have constitutional implications, the solution is not to "declare the FCRA's statutory damages provision unconstitutional either facially or as applied in this class action context," as defendants urge, Defs. SJ Br. at 45-46, but, after trial—if the jury finds defendants acted willfully and returns an adverse verdict against them—to reduce the actual verdict sufficiently to avoid entering a constitutionally excessive judgment. This Court has already held that a statutory-damage award large enough to "implicate due process concerns . . . can be nullified through reduction of the award." *In re Farmers* April 2006 decision, 2006 WL 1042450, at *11 (quoting *Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22 (2d Cir. 2003) ("[I]n a sufficiently serious case the due process clause might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award."); *Murray*, 434 F.3d at 954 ("An award that would be unconstitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified.") (omitting internal citation)).[11]

---

would invite defendants to violate the law on a grand scale.
*In re Farmers* April 2006 decision, 2006 WL 1042450, at *11; *accord White v. E-Loan*, No. C 05-02080 SI, 2006 WL 2411420, at *8 n.8 (N.D. Cal. Aug. 18, 2006) (FCRA) ("under the logic of E-Loan's argument, the greater the number of violations of the FCRA, the less likely a company can be held fully accountable"); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 650 (W.D. Wash. 2007) (Truth in Lending Act); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 50 P.3d 844, 851 (Ariz. Ct. App. 2002) (TCPA).

[11] *Accord Soprych*, 2009 WL 498535, at *1 ("[I]t would be premature to dismiss the complaint based on the potential for a constitutionally excessive damages award. If there is an award, and if it is unconstitutionally excessive, the court may reduce it.").

Thus, in the due-process decision that defendants discuss at greatest length, *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990), *discussed in* Defs.' SJ Br. 33, 41, the Ninth Circuit did reduce a statutory-damages under a farm-worker protection statute on due-process grounds, but did so only after trial, after a finding of liability, and after an actual verdict. Likewise, other courts to address the merits of constitutional excessiveness challenges have done so after trial, after findings of liability, and after actual verdicts. *See, e.g., Zomba Enters., Inc.* v. *Panorama Records, Inc.*, 491 F.3d 574, 587-88 (6th Cir. 2007), *reh'g en banc denied*, Nos. 06-5013 & 06-5266 (6th Cir. Oct. 5, 2007), *cert. denied*, 553 U.S. ___, 128 S. Ct. 2429 (2008) (considering due-process excessiveness challenge to statutory damages under Copyright Act, and rejecting it on its merits, where there was an actual jury verdict to review; *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 459-60 (D. Md. 2004) (entertaining, and rejecting on the merits, an excessiveness challenge to Copyright Act statutory damages, where challenge asserted after jury returned verdict for $19 million in statutory damages).[12]

In the same way, this Court should see if the jury finds liability and returns a statutory-damages verdict, and if so, only then consider whether the Constitution requires reducing the verdict. Defendants' request that this Court declare FCRA's statutory-

---

[12] Likewise, the Northern District of Illinois recently considered (and rejected on the merits) an Excessive Fines Clause challenge to a decision imposing $190 million in statutory penalties under the False Claims Act and a similar state statute, but only after liability was found. *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 748 (N.D. Ill. 2007), *appeals dismissed per stipulation*, Nos. 07-2111 & 07-2113 (7th Cir. Sept. 12, 2008).

damages provision unconstitutional is premature, and the Court has already observed that an actual jury verdict large enough to implicate due-process concerns can be reduced for constitutional excessiveness after trial. *In re Farmers* April 2006 decision, 2006 WL 1042450, at *11. If defendants want an answer to their constitutional question now, the answer should be that the statute is constitutional.

C.     **FCRA statutory damages are not subject to, and in any event do not violate, constitutional limitations on jury awards of punitive damages**

Much of defendants' due-process excessiveness arguments rest upon the Supreme Court's recent decisions in punitive-damages cases, such as *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003). Defendants cite those decisions to suggest that "actual harm" must be proven to obtain statutory damages, or at any rate that statutory damages greater than the minimum possible must be "proportional" to proven "actual harms." Defs.' SJ Br. 40, 44-46. As shown below, these punitive-damage decisions are inapposite, and in any event, do not stand for the propositions that defendants claim.

1.     ***Statutory-damage ranges enacted by Congress are not subject to the due process tests that courts apply to review jury awards of punitive damages***

Although *Williams* was a civil-penalty decision, rather than a statutory-damages decision, any excessiveness review of FCRA statutory damages would be governed by standards similar to those *Williams* prescribes for statutory penalties, and not by the standards the Supreme Court has developed in recent decades for courts to review jury awards of punitive damages. This is because statutory damage statutes do not threaten

the unforeseeable and unbounded liability of the punitive-damage jury verdicts that the Court subjected to exacting judicial scrutiny in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and such progeny as *State Farm*.  As the Supreme Court has explained, judicial review "of a jury's award for arbitrariness and the review of legislation surely are significantly different."  *TXO Prod. Corp.*, 509 U.S. at 456.

*Gore*'s own framework makes clear that statutory damages are outside the ambit of the Court's standards for reviewing jury punitive-damage awards.  *Gore* formulated three basic "guideposts" for courts to evaluate whether jury punitive-damage verdicts are impermissibly excessive under the Due Process Clause: (1) "the degree of reprehensibility" of the defendant's actions; (2) "the disparity between the harm or potential harm suffered" by the plaintiff and the magnitude of the award; and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  *Gore*, 517 U.S. at 575; *see also State Farm*, 538 U.S. at 418.  These "guideposts" are not a test for excessiveness *per se*, but a test of whether a defendant had "constitutionally adequate notice of the magnitude of the sanction that [the government] might impose" on him.  *Gore*, 517 U.S. at 574.  Thus, *Gore* renders an "excessive" punitive-damages award unconstitutional not due to its size alone, but because due process required that the defendant have fair notice of the magnitude of its potential liability.

Because fair notice is the ultimate touchstone of *Gore* and its progeny, *Gore*'s guideposts are irrelevant to statutory damages such as those Congress authorized here.

22

Unlike punitive damages, which have no fixed limit, § 1681n(a)(1)(A) establishes clear and specific bounds that give defendants notice of the magnitude of their potential liability.  It was this statutory feature that led the Supreme Court to hold in *Batchelder* that indeterminate criminal sentencing statutes provide criminal defendants with constitutionally adequate notice.  *United States v. Batchelder*, 442 U.S. 114 (1979). Statutory damages under FCRA provide equally adequate notice.

The *Gore* framework is also inapposite to statutory damages because it calls upon a court to compare a jury's punitive-damage verdict to "the civil penalties authorized or imposed in comparable cases."  *Gore*, 517 U.S. at 575.  Applying *Gore* here would require comparing FCRA's statutory-damages provision to itself.

That *Gore* uses civil penalties as a constitutional benchmark further demonstrates that its three-part test is not meant to govern such legislative enactments.  In fact, to the contrary, *Gore* holds that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue."  *Gore*, 517 U.S. at 583 (internal quotation marks omitted).  FCRA's statutory damages provision necessarily embodies "legislative judgments concerning appropriate sanctions," and is therefore entitled to "substantial deference" that jury punitive-damage verdicts do not share.

For all of these reasons, other courts have declined to review statutory damage awards under *Gore* and its progeny. For example, in *Zomba Enterprises*, 491 F.3d at 587-88, the Sixth Circuit held that awards of statutory damages under the Copyright Act are

23

subject to review not under *Gore*, but instead under the *Williams* standard for civil

penalties.  *Id.* at 587-88.  The Sixth Circuit added that the *Williams* standard "is

extraordinarily deferential—even more so than in cases applying abuse-of-discretion

review." *Id.* at 587.[13]  Similarly, in *Lowry's Reports*, 302 F. Supp. 2d at 459-60, the

district court held that *Gore*'s standards did not apply to judicial review of a jury verdict

for $19 million in statutory damages under the Copyright Act.  The court pointed out that

"[s]tatutory damages exist in part because of the difficulties in providing—and providing

compensation for—actual harm," and "may only be awarded when a plaintiff forgoes the

right to collect actual damages." *Id.* at 460.  The court reasoned that "[t]he unregulated

and arbitrary use of judicial power that the *Gore* guideposts remedy is not implicated in

Congress's carefully crafted and reasonably constrained statute." *Id.* *Lowry*'s reasoning

applies even more forcefully here, where the maximum award is $1,000 per willful

violation, rather than $150,000 per willfully copyrighted work.

FCRA's statutory damages range of $100 to $1,000 is comparable to the $500

mandatory statutory damages amount Congress set for transmitting unsolicited fax

advertisements in violation of the Telephone Consumer Protection Act (TCPA), 47

U.S.C. § 227(b)(3)(B); and the courts have repeatedly rejected the same due-process

excessiveness challenges raised here when made against TCPA's $500 statutory damage

---

[13] *See also United States ex rel. Tyson*, 488 F. Supp. 2d at 748 (observing that "considerations pertinent to the validity of jury awards are not the same as those attendant to damage amounts set by statutes").

provision.[14] Courts considering excessiveness challenges to various other statutes have

also found *Gore* and its progeny inapplicable.[15]

> ## 2. Even if the standards for reviewing jury punitive-damage awards governed the constitutionality of federal statutes, the Court would still have to consider potential harm as well as actual harm

Defendants rely upon scattered comments in Supreme Court decisions for

reviewing jury awards of punitive damages to claim that "actual harm" must be proven to

---

[14] *Centerline Equip.*, 545 F. Supp. 2d. at 777-78; *Sadowski v. Med1 Online, LLC*, No. 07-C-2973, 2008 WL 489360, at *5-*6 (N.D. Ill. Feb. 20, 2008); *Italia Foods, Inc v. Marinov Enters., Inc.*, No. 07-C-2494, 2007 WL 4117626, at *4 (N.D. Ill. Nov. 16, 2007); *Phillips Randolph Enters., LLC v. Rice Fields*, No. 06-C-4968, 2007 WL 129052, at *2 (N.D. Ill. Jan. 11, 2007); *Accounting Outsourcing, LLC. v. Verizon Wireless Pers. Commc'ns, LP*, 329 F. Supp. 2d 789, 808-09 (M.D. La. 2004); *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090-91 (W.D. Tex. 2000); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1165-67 (S.D. Ind. 1997); *ESI Ergonomic*, 50 P.3d at 850; *Kaufman*, 2 Cal. Rptr. 3d at 325-26; *Harjoe v. Herz Fin.*, 108 S.W.3d 653, 654-55 (Mo. 2003) (*per curiam*); *Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365, 385-86 (Tex. App. 2004), *rev'd on other grounds*, 184 S.W.3d 707 (Tex. 2006).

At least four of these decisions explicitly refused to apply *Gore* and other punitive-damage decisions to excessiveness challenges to statutory damages under the TCPA. *Sadowski*, No. 07-C-2973, 2008 WL 489360, at *5; *Phillips Randolph*, No. 06-C-4968, 2007 WL 129052, at *2; *Accounting Outsourcing*, 329 F. Supp. 2d at 809; *Kenro*, 962 F. Supp. at 1165.

[15] *Scofield v. Telecable of Overland Park, Inc.*, 751 F. Supp. 1499, 1522 (D. Kan. 1990) (statutory damages under Cable Communications Privacy Act), *rev'd on other grounds*, 973 F.2d 874 (10th Cir. 1992); *Arrez*, 522 F. Supp. 2d at 1008 (statutory damages under state law for failure to pay employees earned vacation and holiday pay); *DirecTV, Inc. v. Cantu*, No. SA-04-CV-136-RF, 2004 WL 2623932, at *4 (W.D. Tex. Sept. 29, 2004) (statutory damages under state law prohibiting satellite TV piracy); *Native Am. Arts, Inc. v. Bundy-Howard, Inc.*, 168 F. Supp. 2d 905, 914 n.6 (N.D. Ill. 2001) (statutory damages under Indian Arts and Crafts Act); *Express Valet, Inc. v. City of Chicago*, 869 N.E.2d 964, 981-82 (Ill. App. Ct. 2007) (statutory penalties for operating valet parking facilities without municipal license); *In re Marriage of Chen & Ulner*, 820 N.E.2d 1136, 1152 (Ill. App. Ct. 2004) (statutory damages under state law against employer for failing to forward child-support moneys withheld from employee's pay).

obtain statutory damages, or at any rate that statutory damage awards greater than the minimum possible must be "proportional" to proven actual harms.  Defs.' SJ Br. 40, 44-46.  Even if such decisions applied to statutory-damage legislation and verdicts, and even if defendants had cited record materials showing that plaintiffs have no evidence that any class member suffered any "actual harm" (*but see* pages 2-3, *supra*), *Gore* and its progeny look to "the harm *or potential harm*" suffered by plaintiffs.  *Gore*, 517 U.S. at 575 (emphasis added); *State Farm*, 538 U.S. at 418 ("the disparity between [the award and] the actual *or potential* harm suffered by the plaintiff") (emphasis added); *TXO Prod. Co. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused") (emphasis in original).  Defendants' thousands or hundreds of thousands of violations manifestly had the *potential* to cause grave losses to their policy-holders.

### 3. *Due process does not require that substantial statutory-damage awards be supported by proof of "actual harm"*

It has been the law of the case for three years that "the recovery of statutory damages under the FCRA is not dependent on proof of injury or harm [and] plaintiffs are not required to present individualized proof of injury from each class member to obtain an award of statutory damages."  *In re Farmers* April 2006 decision, 2006 WL 1042450, at *9 (citations omitted); *see also, e.g.*, *Murray*, 434 F.3d at 953 ("statutes such as the Fair Credit Reporting Act provide for modest [statutory] damages without proof of injury"); *Ramirez*, 537 F. Supp. 2d at 1168-69.  But defendants imply that unless there is proof of actual injury, the Due Process Clause requires awarding the smallest amount of statutory

damages that Congress authorized.  Defs.' SJ Br. 44-45.  To the contrary, statutory damage awards larger than the smallest possible are routinely awarded in other contexts without proof of "actual injury."  Indeed, *maximum* awards have been issued (and affirmed on appeal) without such evidence.  *See, e.g.*, *Douglas v. Cunningham*, 294 U.S. 207, 208, 210 (1935) (Copyright Act; upholding maximum possible statutory damages where newspaper published author's story in 384,000 Sunday issues; "at the close of the trial the petitioners admitted inability to prove actual damages"); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336-37 (9th Cir. 1990) (Copyright Act; affirming maximum possible statutory damages award of $4 million, even though plaintiff's harms were said to be nominal).  Defendants are mistaken to contend that the Due Process Clause requires that anything greater than minimal statutory damages must be supported by proof of actual injury.

### D. Defendants do not have greater due process rights in class-action cases than in individual party actions

Much of defendants' due-process excessiveness argument (and indeed much of the second half of their brief) does not draw upon decisions applying the Due Process Clause, but instead upon decisions applying the Federal Rules of Civil Procedure and refusing to certify classes seeking statutory damages, on the ground that exposing a defendant accused of widespread wrong-doing to a large damage verdict would not be "superior to other available methods for fairly and efficiently adjudicating the controversy," as required for certification under Fed. R. Civ. P. 23(b)(3).  *See, e.g.*, Def.s' SJ Br. 30-31, 34 n.18, 40, 42-43 & n.25.  Defendants acknowledge that these were class-certification

decisions, *id.* at 43, and that this Court has already certified the class, *id.*; indeed, they go so far as to ask the Court, based upon these decisions, to "bar Plaintiffs from recovering aggregated [*i.e.*, class] statutory damages," *id.* at 34, or in the alternative, to decertify the class, *id.* at 44 n.26.

But defendants go wrong in claiming that "these [class-certification] cases are not for that reason any less apposite [to defendants' due-process excessiveness challenge]. Indeed, it is precisely *because* a class has been certified that the constitutional violation those courts sought to avoid is unavoidable here." *Id.* at 43. To the contrary, defendants spend pages repeating their previous arguments against class certification, even though the Court already thoroughly considered—and rejected—them in its April 2006 decision. As examples:

| Topic | Defs.' Nov. 2005 Opp'n Br. (R. 531) | *In re Farmers* April 2006 decision, 2006 WL 1042450 | Defs.' current SJ Br. (R. 945) |
|---|---|---|---|
| *Ratner v. Chem. Bank N.Y. Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972) | 21-23 | Star pages *9-*10; star page *11 | 30-31 |
| Argument that plaintiffs have adequate incentive to sue without class mechanism | 21, 26-27 | Star page *11 | 29, 30, 33, 44 n.26 |
| *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir. 1973) | 21, 23 n.4 | Star page *12 | 40 |

Defendants do not acknowledge the Court's detailed consideration of their arguments three years ago, much less acknowledge that the Court's decision is the law of

the case or the standards for reconsideration.[16]  To detail one example (beyond those in

the table above), defendants resurrect their extensive discussion of the legislative history

of the Truth in Lending Act's from the early 1970s that culminated in Congress's capping

class-action statutory damages under that statute.  *Compare* Defs.' Nov. 2005 Opp'n Br.

23-25 (R. 531) *with* Defs.' SJ Br. 31.  But when the defendants discussed *Ratner* and the

Truth in Lending Act's legislative history at length three years ago, the Court responded

with an extensive discussion of two pertinent Supreme Court decisions issued after

*Ratner* was decided:  "After the ruling in *Ratner,* the United States Supreme Court

specifically determined that class relief is available for any claim unless Congress

expressly limits such relief."  *In re Farmers* April 2006 decision, 2006 WL 1042450, at

*10 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) ("[i]n the absence of a

direct expression by Congress of its intent to depart from the usual course of trying 'all

suits of a civil nature' under the [Federal] Rules [of Civil Procedure] established for that

purpose, class relief is appropriate in civil actions brought in federal court. . . .")).

A few paragraphs later, the Court went on to discuss a second post-*Ratner*

Supreme Court decision addressing the size of damage awards in consumer class-action

cases:  "In addition, the United States Supreme Court in *Reiter v. Sonotone Corp.,* 442

---

[16] As the Court observed last year:
Motions for reconsideration have a very limited function in that they give
the court an opportunity to correct manifest errors of law or fact and to
review newly discovered evidence or change in the law.  A party may not
use a motion for reconsideration as a second opportunity to present its
strongest case.
*Madoux v. City of Norman*, No. CIV-07-0435-F, 2008 WL 619360, at *1 (W.D. Okla.
Feb. 28, 2008) (Friot, J.) (citations omitted).

U.S. 330, 344-345 (1979) (another decision after *Ratner*), rejected an argument to deny class action relief under the Clayton Act because 'the cost of defending consumer class actions will have a potentially ruinous effect on small businesses in particular and will ultimately be paid by consumers in any event,' stating that these 'policy considerations [are] more properly addressed to Congress than to this Court.' " *In re Farmers* April 2006 decision, 2006 WL 1042450, at *11. Defendants make no effort to engage with the Court's previous analysis; they do not even cite the Supreme Court's decisions in *Califano* or *Reiter*, much less attempt to distinguish them. To hold that due process upends a statutory-damages scheme when placed in a class-action context, as defendants urge, would effectively insulate large-scale violators from enforcement. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). The Constitution requires no such result.

<u>**CONCLUSION**</u>

For the reasons stated above, the Court should find that FCRA's statutory damages provision, 15 U.S.C. § 1681n(a)(1)(A), is not void for vagueness. The Court should decline to rule on whether a potential statutory-damages verdict might be constitutionally excessive, as premature; but if the Court does wish to consider defendants' due-process excessiveness challenge now, it should hold that FCRA's range of statutory damages comports with due process.

Respectfully submitted,

Dated: May 8, 2009
　　　　Washington, DC

**FOR THE UNITED STATES OF
AMERICA**
MICHAEL F. HERTZ
Deputy Assistant Attorney General
Civil Division
U.S. DEPARTMENT OF JUSTICE
JOHN C. RICHTER
United States Attorney

　s/ Kay Sewell
KAY SEWELL
Assistant United States Attorney
210 West Park Avenue, Suite 400
Oklahoma City, OK  73102
Telephone: 405-553-8807
Fax: 405-553-8885
kay.sewell@usdoj.gov


EUGENE M. THIROLF, Director
KENNETH L. JOST, Deputy Director

　s/ Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
Trial Attorney, Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, D.C.  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail: daniel.crane-hirsch@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record, including the following:

**Plaintiffs' Co-Lead Counsel**

Gary D. Corum (gary@wecc-law.com)
Wilson, Engstrom, Corum & Coulter
200 S. Commerce, Suite 600
PO Box 71
Little Rock, AR  72203-0071

Scott E. Poynter (scott@emersonfirm.com)
Emerson Poynter, LLP
305 The Museum Center
500 President Clinton Avenue
Little Rock, AR  72201

William B. Federman (wfederman@aol.com)
Federman & Sherwood
10205 N. Pennsylvania Ave.
Oklahoma City, OK  73120

Earl P. Underwood, Jr. (epunderwood@alalaw.com)
Law Offices of Earl P. Underwood, Jr.
21 S. Section St.
PO Box 969
Fairhope, AL  36533

Richard E. Norman (rnorman@cdnlawfirm.com)
R. Martin Weber, Jr. (mweber@cdnlawfirm.com)
Crowley Norman, LLP
Three Riverway, Suite 1775
Houston, TX  77056-2016

David H. Burrow (dburrow@bpcd.com)
Burrow & Parrott LLP
1301 McKinney St., Suite 3500
Houston, TX  77010

**Defendants' Lead Counsel:**

Barnes H. Ellis (bhellis@stoel.com)
Timothy W. Snider (twsnider@stoel.com)
Stoel Rives LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204

**Intervenor-Plaintiff United States'
Counsel:**
Daniel K. Crane-Hirsch (daniel.crane-
        hirsch@usdoj.gov)
Trial Attorney, Office of Consumer
Litigation
U.S. Department of Justice
PO Box 386
Washington, D.C.  20044-0386

Kay Sewell (kay.sewell@usdoj.gov)
Assistant United States Attorney
210 West Park Avenue, Suite 400
Oklahoma City, OK  73102

  s/ Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
Trial Attorney, Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, D.C.  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail: daniel.crane-hirsch@usdoj.gov

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re Farmers Insurance FCRA Litigation | Case No. 5:03-cv-158-F<br><br>MDL No. 1564 |
| Judge Friot | **This document relates to** *Corl*, *Mobbs*, **and** *Watts* |

**DECLARATION OF DANIEL K. CRANE-HIRSCH IN SUPPORT OF THE
UNITED STATES' OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT
MOTION,  TO THE EXTENT OF DEFENDING THE CONSTITUTIONALITY
OF STATUTORY DAMAGES UNDER THE FAIR CREDIT REPORTING ACT**

I.      My name is Daniel K. Crane-Hirsch.  I am an attorney for the United States of
America, and am over 18 years of age.

II.     The attached exhibits are true and accurate copies of the following:

| Exhibit | Description |
|---|---|
| 1 | S. Rep. No. 91-517 (1969) |
| 2 | 115 Cong. Rec. 33,408-12 (1969) (comments of Sens. Proxmire and Williams) |

Signed under penalties of perjury under 28 U.S.C. § 1746.

Dated: May 8, 2009          s/ Daniel K. Crane-Hirsch
           Washington, DC          DANIEL K. CRANE-HIRSCH
                                    Trial Attorney, Office of Consumer Litigation
                                    U.S. Department of Justice
                                    PO Box 386
                                    Washington, DC  20044-0386
                                    Telephone: 202-616-8242
                                    Facsimile: 202-514-8742
                                    E-mail: daniel.crane-hirsch@usdoj.gov

Calendar No. 511

| 91ST CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 91–517 |
| --- | --- | --- |

# FAIR CREDIT REPORTING

## REPORT

OF THE

## COMMITTEE ON
## BANKING AND CURRENCY
## UNITED STATES SENATE

TO ACCOMPANY

## S. 823



NOVEMBER 5, 1969.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1969

37–010

Crane-Hirsch Exhibit 1, page 1 of 11

## COMMITTEE ON BANKING AND CURRENCY

JOHN SPARKMAN, Alabama, *Chairman*

| | |
|---|---|
| WILLIAM PROXMIRE, Wisconsin | WALLACE F. BENNETT, Utah |
| HARRISON A. WILLIAMS, Jr., New Jersey | JOHN G. TOWER, Texas |
| EDMUND S. MUSKIE, Maine | EDWARD W. BROOKE, Massachusetts |
| THOMAS J. McINTYRE, New Hampshire | CHARLES H. PERCY, Illinois |
| WALTER F. MONDALE, Minnesota | CHARLES E. GOODELL, New York |
| ERNEST F. HOLLINGS, South Carolina | ROBERT W. PACKWOOD, Oregon |
| HAROLD E. HUGHES, Iowa | |
| ALAN CRANSTON, California | |

DUDLEY L. O'NEAL, Jr., *Staff Director and General Counsel*
JOHN R. EVANS, *Minority Staff Director*
KENNETH A. McLEAN, *Professional Staff Member*

(II)

Crane-Hirsch Exhibit 1, page 2 of 11

# CONTENTS

| | Page |
|---|---|
| Purpose of the legislation | 1 |
| History of the legislation | 2 |
| Growth of the credit reporting industry | 2 |
| Problems of the credit reporting industry | 3 |
| Section-by-section summary | 4 |
| Cordon rule dispensed with | 8 |

(III)

S. Rept. 91-517

Crane-Hirsch Exhibit 1, page 3 of 11

# Calendar No. 511

| 91st Congress } | SENATE | { Report |
|---|---|---|
| *1st Session* } | | No. 91–517 |

## FAIR CREDIT REPORTING

---

November 5, 1969.—Ordered to be printed

---

Mr. Proxmire, from the Committee on Banking and Currency, submitted the following

## REPORT

### [To accompany S. 823]

The Committee on Banking and Currency, to which was referred the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information, having considered the same, reports favorably thereon with amendments and recommends that the bill (as amended) do pass.

### Purpose of the Legislation

The purpose of the fair credit reporting bill is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. The bill also seeks to prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information.

Whenever an individual is rejected for credit, insurance or employment because of an adverse credit report, the individual is given the right to be told the name of the agency making the report.

Credit reporting agencies would be required to inform the consumer of all the information in his credit file. Following disclosure, the consumer would be given an opportunity to correct inaccurate or misleading information in his credit file. In addition, the bill requires that the information in a person's file be kept confidential and used only for legitimate-business transactions. Under most circumstances, adverse information older than 7 years could not be reported. The legislation also establishes the right of a consumer to be informed of investigations into his personal life.

The bill covers reports on consumers when used for obtaining credit, insurance or employment. However, the bill does not cover business credit reports or business insurance reports.

(1)

S. Rept. 91–517

Crane-Hirsch Exhibit 1, page 4 of 11

2

The bill recognizes the vital role played by credit reporting agencies in our economy. Those who extend credit or insurance or who offer employment have a right to the facts they need to make sound decisions. Likewise, the consumer has a right to know when he is being turned down for credit, insurance, or employment because of adverse information in a credit report and to correct any erroneous information in his credit file. The procedures established in the bill assure the free flow of credit information while at the same time they give the consumer access to the information in his credit file so that he is not unjustly damaged by an erroneous credit report.

## History of the Legislation

The Fair Credit Reporting bill was introduced by Senator William Proxmire on January 31, 1969. Hearings before the Subcommittee on Financial Institutions were held from May 19 through May 23. The subcommittee met in executive session on October 9 and recommended the bill with amendments to the full committee. The full committee met on October 22 and ordered the bill reported with additional amendments.

## Growth of the Credit Reporting Industry

One of the phenomenal growth records since the end of World War II has been the growth of the consumer credit industry. At the end of 1945 the American consumer owed less than $6 billion, whereas he now owes over $116 billion. With the growth of consumer credit, a vast credit reporting industry has developed to supply credit information. The growth of computer technology has facilitated the storage and interchange of information on consumers and opens the possibility of a nationwide data bank covering every citizen.

As an example of the size of the industry, the Associated Credit Bureaus, a major trade association, has over 2,200 individual members serving 400,000 creditors in 36,000 communities. These credit bureaus maintain credit files on more than 110 million individuals and in 1967 they issued over 97 million credit reports. Credit bureaus typically supply information on a person's financial status, bill paying record and items of public record such as arrests, suits, judgments, and the like. The information is generally furnished to creditors for extending credit although it may also be used for employment purposes.

One of the fastest growing credit bureaus already has 27 million files on computer tape. Moreover, the firm is adding names at the rate of 7 million a year. If this growth rate is maintained, the firm will have data on every American family in their computer file within a few years. Last year the firm made 7 million reports to creditors.

Another firm prominent in the insurance reporting field has 1,800 offices in the United States and Canada. This firm has dossiers on 45 million individuals and makes 35 million reports a year to their 40,000 customers. Insurance reporting firms investigate people who apply for insurance, generally through interviews with neighbors and coworkers. Their files include information on a person's character, habits, and morals as well as his financial status. Once the information is in the file, it can be used again for future insurance or employment reports.

S. Rept. 91–517

3

Until this year, there has been virtually no State legislation regulating credit reporting other than a 1916 Oklahoma statute with limited scope. In 1969, credit reporting legislation was introduced in 27 states and two States—Massachusetts and New Mexico—passed a statute. Because of the nationwide character of the credit reporting business, firms which operate on a nationwide scale expressed a preference for Federal regulation rather than State legislation during the hearings on S. 823. Moreover, New York State officials who testified expressed a need for Federal legislation to supplement any future State legislation which may be enacted.

## Problems of the Credit Reporting Industry

Given the rapid expansion of the credit reporting industry and the almost complete lack of regulation, it is inevitable that some problems will arise. For the most part, the credit reporting system has served the consumer well and the abuses have not been widespread. Nonetheless, congressional hearings have shown that some abuses do exist. Moreover, industry leaders have agreed that there have been some abuses and many have already taken voluntary steps to correct them. The leaders of the credit reporting industry are likewise agreed upon the need for Federal legislation to insure that guidelines apply uniformly and fairly to all segments of the industry.

One problem which the hearings on S. 823 identified is the inability at times of the consumer to know he is being damaged by an adverse credit report. Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer. In some cases, the user is even precluded from mentioning the name of the credit reporting agency. Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story.

A second problem is that even if the person knows the name of the credit reporting agency, he is not always given access to the information in his file. Insurance reporting firms generally do not admit to making a report on an individual and ordinarily will not reveal the contents of their file to him. Credit bureaus sometimes build roadblocks in the path of the consumer. For example, the credit bureau industry trade publication, in frankly discussing this problem, states that some bureaus discourage consumer interviews "by placing a nuisance charge on the investigation, or merely placing the date of the interview as much as 2 weeks away."

A third problem is that even when individuals gain access to the information in their credit file, they sometimes have difficulty in correcting inaccurate information. Some credit reporting agencies proceed on the assumption that an individual is guilty until proven innocent and refuse to delete information which is no longer verifiable unless the consumer can prove otherwise. In other cases, the consumer may have difficulty in getting his version of a legitimate dispute recorded in his credit file. For example, a consumer may withhold payment from a creditor because the merchandise was defective. His credit record may simply show that he has refused to pay without entering his reasons.

S. Rept. 91–517

Crane-Hirsch Exhibit 1, page 6 of 11

4

A fourth problem is that the information in a person's credit file is not always kept strictly confidential. As an example, a reporter for a major TV network was able to obtain 10 out of 20 reports requested at random from 20 credit bureaus by using the name of a completely fictitious company under the guise of offering the individuals credit.

A fifth problem is that investigative type credit reports sometimes gather highly sensitive and personal information about a person's private life, such as racial or ethnic descent, domestic trouble, housekeeping habits, and conditions of yard. Moreover, because of its very nature much of the information on a person's general character, habits and morals is based on someone's subjective opinion rather than objective fact. Some of the information collected on investigative reports may be only marginally related to the purpose of granting credit or insurance and may tend to invade the individual's right to reasonable privacy.

A sixth problem deals with the handling of public record information. Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available. Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped. Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

A seventh problem is concerned with the reporting of information about a person's earlier credit difficulties. Creditors obviously have a right to know if a person has had trouble in paying his bills. At the same time it can be unfair to burden a consumer for life with a bad credit record if he has improved his performance. The Associated Credit Bureaus has recognized this problem and had proposed voluntary guidelines to its members to the effect that adverse information not be reported if it is older than 7 years or 14 years in the case of bankruptcies. Nonetheless, these guidelines are not necessarily followed by reporting agencies who are not members of the ACB.

## Section-By-Section Summary

*Section 601.—Short Title.*—This section indicates that the act may be cited as the "Fair Credit Reporting Act."

*Section 602.—Statement of Purpose.*—This section indicates a need to establish safeguards for the reporting of information on consumers so as to assure its confidentiality, accuracy, relevancy, and proper utilization.

*Section 603.—Definitions and Rules of Construction.*—A "consumer report" is defined under subsection (d) as a report on an individual when the information has been collected or is to be used for credit, insurance, or employment purposes. The term does not include information reported by a creditor or other person when the information is confined to the creditor's own transactions or experience with the consumer. However, if the creditor obtains information on a consumer

S. Rept. 91-517

from third parties and reports it to another person, such communication would be deemed a consumer report regardless of whether a fee was charged for the report.

The term "consumer report" also does not include communications between a credit card company and a retail merchant when the communication authorizes or approves a specific extension of credit directly or indirectly by the credit card company. The term "directly or indirectly" is used to cover the situation where the legal arrangements on which the credit card plan is based call for the merchant to extend the credit and assign the resulting evidence of indebtness to the credit card company. In such instance, the credit card company is indirectly extending the credit. The credit card company would be required, as a creditor, to comply with the disclosure provisions of section 615.

Finally, the term "consumer report" does not cover communications between a finance company or other creditor and a retail merchant concerning the approval of a specific extension of credit directly or indirectly by the finance company, provided the merchant identifies the finance company and the finance company complies with the disclosure provisions of section 615. The word "indirectly" again refers to the situation where the retail merchant initially extends credit but then assigns the resulting evidence of indebtedness to the finance company or other creditor who approved the transaction.

The purpose of these exclusions is to assure that creditors who are acting as creditors are not classified as a consumer reporting agency, provided they comply with the disclosure obligations required of creditors under section 615.

Under subsection (e), the term "investigative consumer report" is further defined as one in which personal-type information on a consumer's character, reputation, personal characteristics, or mode of living is obtained through interviews with neighbors, associates, and the like.

Under subsection (f), the term "consumer reporting agency" is defined as anyone who regularly furnishes consumer reports whether for fees or otherwise. If a creditor regularly compiles information on consumers from third parties and furnishes that information to other persons either for fees or otherwise, the creditor becomes a consumer reporting agency and is subject to the applicable provisions of the act.

*Section 604.—Permissible Purposes of Reports.*—This section limits the furnishing of consumer reports to five purposes: (1) credit; (2) insurance; (3) employment; (4) obtaining a governmental license or other benefit; or (5) other legitimate business need involving a business transaction with the consumer. Any broader use would require either a court order or the consumer's written permission.

*Section 605.—Obsolete Information.*—This section prohibits the reporting of adverse information older than 7 years, or 14 years in the case of information on bankruptcies, except in connection with life insurance contracts in excess of $25,000, extensions of creidt in excess of $50,000, or employment applications for jobs with an annual salary in excess of $20,000.

*Section 606.—Disclosure of Investigative Reports.*—This section requires those who order investigative reports to disclose to the consumer that an investigative report may be made, that the report may in-

S. Rept. 91–517

6

volve information on his character, general reputation, personal characteristics and mode of living as applicable, and that he has the right to request a complete and accurate disclosure of the nature and scope of the investigation. This provision would not apply if the report is for employment purposes and the consumer has not specifically applied for the employment.

*Section 607.—Compliance Procedures.*—This section requires reporting agencies to maintain procedures to preserve the confidentiality and proper use of information. Users must certify the purposes for which information will be used and agree not to use the information for other purposes. A reporting agency must make a reasonable effort to check out new users and refrain from making reports if it has reasonable grounds for believing the report will not be used for an authorized purpose.

*Section 608.—Disclosures to Governmental agencies.*—The disclosure of information to governmental agencies is limited to identifying type information such as name, address and place of employment unless the governmental agency has obtained a court order or is a bona fide creditor, insurer, employer, or licensor.

*Section 609.—Disclosures to Consumers.* This section requires reporting agencies to disclose, at the request of a consumer, the nature and substance of all information in the consumer's file, the sources of the information unless it is an investigative report, and the persons who have received reports on the consumer during the past 6 months for credit or insurance purposes and the past 2 years for employment purposes.

*Section 610.—Conditions of Disclosure to Consumers.*—This section requires disclosures to be made during normal business hours and on reasonable notice. The disclosure may be made at the credit reporting agency or over the phone if the consumer so requests in writing and furnishes proper identification. Reporting agencies must provide trained personnel to explain the information in a consumer's file. The consumer has the right to have one person accompany him. Reporting agencies, their sources and the users of information are given immunity from libel or other suits as a result of information in their credit file disclosed to consumers pursuant to section 609, 610 and 615 unless the information was furnished with malice or willful intent to injure the consumer. The immunity provisions under this section do not extend to information acquired by a consumer through other means.

*Section 611.—Procedure in Case of Disputed Accuracy.*—If the completeness or accuracy of an item of information is challenged by a consumer, the credit reporting agency must reinvestigate and record its current status. Inaccurate or unverifiable information must be deleted. The consumer has a right to file a brief explanatory statement on disputed items which must accompany future reports. The consumer may also request that previous recipients be notified of any corrections.

*Section 612.—Charges for Certain Disclosures.*—Disclosures shall be free of charge to consumers who are rejected for credit, insurance, or employment or who are charged higher rates for credit or insurance and who have been so notified by the creditor, insurer, or employer.

Crane-Hirsch Exhibit 1, page 9 of 11

7

Similarly, disclosure charges cannot be made to persons who have received a dunning letter from a collection affiliate of the reporting agency. In all other cases, the reporting agency may establish a reasonable disclosure charge.

The cost of sending corrected information to the prior recipients of a report shall be at the expense of the reporting agency when information is deleted because it is inaccurate or unverifiable. When the item is in dispute, the reporting agency may charge the consumer for notifying prior recipients.

*Section 613.—Public Record Information for Employment Purposes.—* Reporting agencies cannot report adverse items of public record information for employment purposes unless they maintain strict procedures to keep the information up to date. If this cannot be done, the consumer must be notified that the adverse information is being reported and to whom at the time the report is made.

*Section 614.—Restrictions on Investigative Consumer Reports.—* Adverse information developed on investigative reports which is more than 3 months old cannot be reported again unless it is reverified. Those who make investigative reports must follow procedures to assure maximum possibly accuracy.

*Section 615.—Requirements on Users of Consumer Reports.—* Those who reject a consumer for credit, insurance or employment or who charge a higher rate for credit or insurance wholly or partly because of a consumer report must, upon written request, so advise the consumer and supply the name and address of the reporting agency. If a consumer is turned down for credit or charged a higher rate based on information other than a consumer report, the nature and substance of this information must also be disclosed on written request. The consumer's right to make such a request must be disclosed if he is turned down for credit, employment, or insurance or charged a higher rate for credit or insurance. Such disclosure must be made at the time such adverse action is communicated to the consumer. However, the user has no liability under this section until the adverse action has actually been communicated to the consumer.

*Section 616.—Civil Liability for Willful Non-Compliance.—* Consumers can bring civil actions to enforce compliance. If a willful violation can be shown, the consumer can collect actual damages, punitive damages of up to $1,000 and attorney fees.

*Section 617.—Civil Liability for Grossly Negligent Non-Compliance.—* If the consumer can show a grossly negligent violation, he can collect actual damages plus attorney fees.

*Section 618.—Jurisdiction of Courts.—* Civil actions may be brought in Federal or State courts within 2 years of the violation.

*Section 619.—Obtaining Information Under False Pretenses.—* Any person who knowingly and willfully obtains a consumer report under false pretenses can be fined up to $5,000 and imprisoned up to 1 year, or both.

*Section 620.—Administrative Enforcement.—* Compliance would be further enforced by the Federal Trade Commission with respect to consumer reporting agencies and users of reports who are not regulated by another Federal agency. The FTC can use the cease and desist authorities and other procedural, investigative and enforcement powers which it has under the FTC Act to secure compliance.

Crane-Hirsch Exhibit 1, page 10 of 11

8

Compliance on the part of financial institutions or common carriers regulated by another Federal agency would be enforced by that agency, using its existing enforcement authorities to bring about compliance.

*Section 621.—Relation to State Laws.*—State laws which are inconsistent with the Federal law are preempted to the extent of the inconsistency. However, no State law would be preempted unless compliance would involve a violation of Federal law.

*Effective Date.* The act becomes effective in 6 months following its enactment.

## Cordon Rule

In the opinion of the committee, it is necessary to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate in connection with this report.

O

Crane-Hirsch Exhibit 1, page 11 of 11



UNITED STATES          OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 91st CONGRESS
FIRST SESSION

## VOLUME 115—PART 25

NOVEMBER 6, 1969, TO NOVEMBER 17, 1969
(PAGES 33255 TO 34516)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1969

Crane-Hirsch Exhibit 2, page 1 of 6

however, are the testimony and observations of many who, although philosophically opposed to Judge Haynsworth, commend the nomination or, at least find the criticism of him unjust. The opinions of those who speak against their own philosophical interests should be entitled to great weight.

Mr. John P. Frank, attorney, testified in favor of Judge Haynsworth. He served as law clerk to Justice Black, he has taught at Yale and Indiana Law Schools, and has written about the Supreme Court, he is a member of the Advisory Committee of the Supreme Court and the Judicial Conference on Civil Procedure. He filed the first brief calling for total school desegregation in 1950 in the case of Sweatt against Painter. He was the first to write in favor of what has become known as the one-man, one-vote rule. He was cocounsel in Miranda against Arizona. In his testimony he said:

I would without doubt have preferred a different administration to be appointing a more liberal Justice. But my side lost an election, and the fact of the matter is that as a member of the bar we are called upon by canon 3 to rise to the defense of judges unjustly criticized, and it is my abiding conviction, sir, that the criticism directed to the disqualification or nondisqualification of Judge Haynsworth is truly an unjust criticism which cannot be fairly made.

This quotation is from page 123 of the hearings record.

Mr. Frank's testimony was directed toward the issue of Judge Haynsworth's ownership of a one-seventh interest in Carolina Vend-A-Matic and whether he should have disqualified himself in the Darlington case. His brief was persuasive. The overwhelming weight of authority required Judge Haynsworth to sit in the case, not to disqualify himself.

Prof. G. W. Foster, Jr., teaches law at the University of Wisconsin. A devoted civil rights advocate, Professor Foster played a prominent role in the promulgation of the original Department of Health, Education, and Welfare school desegregation guidelines in 1965. In his prepared statement which was submitted to the committee and is a part of the record, Professor Foster says:

My presence today is explained by my wish to speak to the charges that Judge Haynsworth is a racial segregationist. Judge Haynsworth is not a segregationist . . .

Judge Haynsworth is an intelligent, sensitive, reasoning man. His record as a judge shows him to be a man capable of continuing growth and responsive to the needs for change where needs are persuasively shown to exist. . . . (H)e will make a first-rate Associate Justice.

Prof. Alexander Bickel, of Yale Law School, summed up, in a recent article for New Republic, as follows:

But President and Senate are partners, and the Constitution gives the President the initiative. If in order to refashion the Court so as to please himself, he were to attempt to move it beyond an ideologically moderate position, senators who are of a different mind ought to resist. But Judge Haynsworth is no reactionary. His civil rights record is centerist, although more cautious than some senators might like. If the Senate demands precisely the ideological profile it would prefer, the appointment process will be in deadlock. Judge Haynsworth should be seen

ideologically as falling within the area of tolerance in which the Senate defers to the President's initiative.

Speaking during the hearings primarily on the issue of Judge Haynsworth's labor rulings was Louis B. Fine who is a former president of the Virginia Bar Lawyers Association, a member of the board of governors of the American Trial Lawyers Association, and who has served as counsel for the Teamster, the Painters Union, the Carpenters Union, and the Longshoremen's Union of Norfolk. He testified:

I think it is manifestly unfair to have said that Judge Haynsworth was antilabor when, as a matter of fact, he only decided the cases and only wrote one opinion out of 10 that were reversed out of a total of 47. Even the Lord couldn't do much better under the total circumstances, and I say that while I have been and am representing labor, labor is not in a fraternity house with the judicial administration of justice. It is just like any other litigant, and that labor must depend upon the economic and social justice as it appears to a conscientious judge.

The evidence is overwhelming that Clement Haynsworth is a conscientious judge. Those who knew him best, his fellows on the Fourth Circuit Court of Appeals, have affirmed their confidence in his integrity and his ability.

The American Bar Association Committee on the Federal Judiciary interviewed a cross-section of the legal community that worked with Judge Haynsworth. Attorneys from each State in the Fourth Circuit were contacted: some represented plaintiffs in personal injury cases, some represented defendants, two were deans of law schools, two represented labor unions, one did admiralty work for shipowners, another represented seamen and longshoremen, two were outstanding Negro lawyers. As Judge Walsh said in summarizing the investigation:

All of the persons interviewed regarding Judge Haynsworth expressed confidence in his integrity, his intellectual honesty, his judicial temperament and his professional ability.

I am impressed by this testimony, the abundance of it, and the sources from which it comes. Judge Haynsworth is not an average, colorless official as some have charged. He has a justly deserved reputation for scholarly analysis and well-written opinions.

I commend President Nixon for making this nomination. The attacks have been furious and the smoke they threw up has been thick, but they have been shown to be without foundation. President Nixon has been unwavering in his support for the nominee. Judge Haynsworth deserves such support.

I yield the floor.

AMENDMENT OF THE CONSUMER PROTECTION CREDIT ACT

The Senate resumed the consideration of the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information.

Mr. PROXMIRE. Mr. President, this is the fair credit reporting bill, which has been reported by the Committee on

Banking and Currency, I believe by a unanimous vote.

The purpose of the fair credit reporting bill is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. The bill also seeks to prevent an unjust invasion of the individual's right to privacy in the collection and dissemination of credit reports.

Whenever an individual is rejected for credit, insurance, or employment because of an adverse credit report, the individual is given the right to be told the name of the agency making the report.

Credit reporting agencies would be required to inform the consumer of all the information in his credit file. Following disclosure, the consumer would be given an opportunity to correct inaccurate or misleading information in his credit file. In addition, the bill requires that the information in a person's file be kept confidential and used only for legitimate business transactions. Under most circumstances, adverse information older than 7 years could not be reported. The legislation also establishes the right of a consumer to be informed of investigations into his personal life.

The bill covers reports on consumers when used for obtaining credit, insurance or employment. However, the bill does not cover business credit reports or business insurance reports.

The bill recognizes the vital role played by credit reporting agencies in our economy. Those who extend credit or insurance or who offer employment have a right to the facts they need to make sound decisions. Likewise, the consumer has a right to know when he is being turned down because of an adverse credit report and to correct any erroneous information in his credit file. The procedures established in the bill assure the free flow of credit information while at the same time they give the consumer access to his credit file so that he is not unjustly damaged by an erroneous credit report.

GROWTH OF THE CREDIT REPORTING INDUSTRY

Mr. President, few Members of the Senate, and I think few people in our country, realize the terrific scope of credit reporting, or realize how rapidly the consumer credit industry has grown. The figures are really astonishing.

One of the phenomenal growth records since the end of World War II has been the growth of the consumer credit industry. At the end of 1945 the American consumer owed less than $6 billion, whereas he now owes over $116 billion. With the growth of consumer credit, a vast credit reporting industry has developed to supply credit information. The growth of computer technology has facilitated the storage and interchange of information on consumers and opens the possibility of a nationwide data bank covering every citizen.

As a matter of fact, it is my understanding that almost every adult in America has a credit file containing information on him. Few individuals realize that these credit files are in existence. However, such a file can have a very serious effect on whether a man gets em-

Crane-Hirsch Exhibit 2, page 2 of 6

ployment or insurance. It can have a disastrous effect, as our hearings show it has had a disastrous effect, on some individuals.

As an example of the size of the industry, the Associated Credit Bureaus, a major trade association, has over 2,200 individual members serving 400,000 creditors in 36,000 communities. These credit bureaus maintain credit files on more than 110 million individuals and in 1967 they issued over 97 million credit reports. Credit bureaus typically supply information on a person's financial status, bill paying record and items of public record such as arrests, suits, judgments, and the like. The information is generally furnished to creditors for extending credit although it may also be used for employment purposes.

One of the fastest growing credit bureaus already has 27 million files on computer tape. Moreover, the firm is adding names at the rate of 7 million a year. If this growth rate is maintained, the firm will have data on every American family in their computer file within a few years. Last year the firm made 7 million reports to creditors.

Another firm prominent in the insurance reporting field has 1,800 offices in the United States and Canada. This firm has dossiers on 45 million individuals and makes 35 million reports a year to their 40,000 customers. Insurance reporting firms investigate people who apply for insurance, generally through interviews with neighbors and coworkers. Their files include information on a person's character, habits and morals as well as his financial status. Once the information is in the file, it can be used again for future insurance or employment reports.

Until this year, there has been virtually no State legislation regulating credit reporting other than a 1916 Oklahoma statute with limited scope. In 1969, credit reporting legislation was introduced in 27 States and two States—Massachusetts and New Mexico—passed a statute. Because of the nationwide character of the credit reporting business, firms which operate on a nationwide scale expressed a preference for Federal regulation rather than State legislation during the hearings on S. 823. Moreover, New York State officials who testified expressed a need for Federal legislation to supplement any future State legislation which may be enacted.

PROBLEMS OF THE CREDIT REPORTING INDUSTRY

Given the rapid expansion of the credit reporting industry and the almost complete lack of regulation, it is inevitable that some problems will arise. For the most part, the credit reporting system has served the consumer well. Nonetheless, congressional hearings have shown that some abuses do exist. Moreover, industry leaders have agreed that there have been some abuses and many have already taken voluntary steps to correct them. The leaders of the credit reporting industry are likewise agreed upon the need for Federal legislation to insure that guidelines apply uniformly and fairly to all segments of the industry.

One problem which the hearings on S. 823 identified is the frequent inability of the consumer to know he is being damaged by an adverse credit report. Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer. In some cases, the user is even precluded from mentioning the name of the credit reporting agency. Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story.

Under the fair credit reporting bill, this problem would be solved by requiring those who turn someone down for credit, insurance or employment because of an adverse credit report to disclose the name and address of the credit reporting agency. The disclosure would be at the written request of the consumer; however, the creditor, insurer, or employer, would be required to disclose to the consumer his right to make such a request at the time the adverse information was communicated. This disclosure requirement would alert consumers that they are being turned down on the basis of an adverse credit report. Other provisions in the bill would then give the consumer an opportunity to correct any misleading or inaccurate information in the report.

A second problem is that even if the person knows the name of the credit reporting agency, he is not always given access to his file. Insurance reporting firms generally do not admit to making a report on an individual and ordinarily will not reveal the contents of their file to him. Credit bureaus sometimes build roadblocks in the path of the consumer. For example, the credit bureau industry trade publication, in frankly discussing this problem, states that some bureaus discourage consumer interviews "by placing a nuisance charge on the investigation, or merely placing the date of the interview as much as 2 weeks away."

The bill deals with this problem by requiring that credit reporting agencies interview consumers during normal business hours and on reasonable notice and disclose all the information in the consumer's file. Moreover, a charge for such interview cannot be made if the consumer is turned down for credit, insurance, or employment, or if he has received a collection letter from a collection affiliate of the credit reporting agency. In other cases, the reporting agency would be permitted to levy a reasonable charge.

Access to the file would also be facilitated by giving the consumer the right to have a person with him when he discusses his credit file. This would enable the Neighborhood Legal Service and similar groups to assist low-income consumers in dealing with credit reporting agencies. In addition, the credit reporting agency would be required to have trained personnel available to discuss a consumer's credit file with him.

A third problem is that even when individuals gain access to their credit file, they sometimes have difficulty in correcting inaccurate information. Some credit reporting agencies proceed on the assumption that an individual is guilty until proven innocent and refuse to delete information which is no longer verifiable unless the consumer can prove otherwise. In other cases, the consumer may have difficulty in getting his version of a legitimate dispute recorded in his credit file. For example, a consumer may withhold payment from a creditor because the merchandise was defective. His credit record may simply show that he has refused to pay without entering his reasons.

The bill would deal with this problem by requiring credit reporting agencies to delete information from their files if it is found to be inaccurate or if it can no longer be verified. If there is a dispute between the consumer and the merchant or other source of information, the consumer is given the right to file a brief explanatory statement setting forth his side of the story. This statement or a clear and accurate summary thereof would have to be included on all subsequent reports made by the credit reporting agency. I am hopeful that this provision would prevent unscrupulous creditors from unjustly damaging the credit reputation of the consumer when the merchant himself is at fault.

A fourth problem is that the information in a person's credit file is not always kept strictly confidential. As an example, a reporter for a major TV network was able to obtain 10 out of 20 reports requested at random from 20 credit bureaus by using the name of a completely fictitious company.

This problem would be dealt with by requiring credit bureaus to maintain procedures to safeguard the confidentiality of the information in their files. Those who requested credit reports would have to certify the purposes for which they are requested and agree not to use the information for any other purposes. The credit reporting agency would have to make a reasonable effort to determine the authenticity of new prospective users of reports. Moreover, any person who obtained a credit report under false pretenses could be fined up to $5,000 and imprisoned up to 1 year, or both.

A fifth problem is that investigative-type credit reports often gather highly sensitive and personal information about a person's private life. Moreover, because of its very nature, most of the information on a person's general character, habits, and morals is based on someone's subjective opinion rather than objective fact. Some of the information collected on investigative reports appears to be only marginally related to the purpose of granting credit or insurance and may tend to invade the individual's right to reasonable privacy.

As an illustration of the personal type of information being collected, the hearings on S. 823 revealed the following items on consumers are included on the report forms of insurance reporting firms; Racial or ethnic descent; drinking habits; reasons for drinking; domestic trouble; immoral conduct; gambling activities; use of drugs; type or reputation of associates; general character and reputation; type of neighborhood; family reputation; housekeeping habits; condition of yard; number of bathrooms per resident; connection with illegal liquor; reasons for divorce or separa-

Crane-Hirsch Exhibit 2, page 3 of 6

tion; care of children; attitude toward authority; quarrelsome behavior; abuse of family; argumentative, antagonistic; antisocial or uncooperative attitudes; and common law marriage. Many of these obviously are not relevant to whether a man should have credit, or whether he is a good credit risk.

This problem would be dealt with by requiring those who order investigative reports on a consumer's character, general reputation, personal characteristics, or mode of living to disclose such fact to the consumer. In addition, the consumer would have the right to receive a complete and accurate disclosure of the nature and scope of the investigation if he makes a written request. His right to make such a written request would also have to be disclosed by the person ordering the investigative report.

I am hopeful that this provision will bring to a halt the unwarranted snooping into a person's private life. Even insurance industry representatives had to admit during the hearings on S. 823 that some of the questions appearing on insurance reporting forms are silly, unnecessary, and unduly intrusive. There seems to be no legitimate reasons why insurance companies need to know the number of bathrooms a person has or whether he is a neat housekeeper or whether he mows his lawn. No actuarial statistics are available to relate these factors to mortality.

A sixth problem deals with the handling of public record information. Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments, and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available. Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped. Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

In order to deal with this problem, the bill requires that if a credit reporting agency collects public record information and furnishes such information to prospective employers, it must maintain strict procedures to keep the information up to date. If this cannot be done the reporting agency must notify the consumer that the adverse information is being reported at the time it is reported. The reporting agency must also disclose the name of the person to whom the information is reported. This disclosure principal would alert consumers to the fact that adverse information of a public nature is being reported on them. If the information is inaccurate or out of date, the consumer would then have an opportunity to correct the information by contacting the credit bureau.

A seventh problem is concerned with the reporting of information about a person's earlier credit difficulties. Creditors obviously have a right to know if a person has had trouble in paying his bills. At the same time it is unfair to burden a consumer for life with a bad credit record if he has improved his performance. The Associated Credit Bureaus has recognized this problem and had proposed voluntary guidelines to its members to the effect that adverse information not be reported if it is older than 7 years or 14 years in the case of bankruptcies. Nonetheless, these guidelines are not necessarily followed by reporting agencies who are not members of the ACB. The Associated Credit Bureaus has worked to enforce these guidelines on a voluntary basis.

The bill would handle this problem by prohibiting the reporting of adverse information older than 7 years or 14 years in the case of bankruptcies, thus extending the ACB voluntary guidelines to other segments of the industry. However, an exemption would be made in the case of large life insurance transactions in excess of $25,000, large credit transactions in excess of $50,000 and employment reports involving an annual salary in excess of $20,000. In these cases, the committee felt that because of the large amounts of money involved the user of the credit report has a right to go back beyond 7 years to determine if there is any adverse information in the person's credit file. However, in the vast majority of cases the 7-year requirement would enable the average consumer to start with a clean slate.

Mr. President, I believe this bill is a reasonable bill. It is fair to the consumer and fair to the credit reporting industry and those who use credit reports. The industry has voluntarily cooperated with the committee in developing sound and workable legislation which accomplishes the objectives without imposing unduly restrictive requirements on the industry. I believe the example we have set in this legislation should serve as a guide to future consumer legislation.

Whenever consumers have a substantial problem in the marketplace, there is no reason why consumer groups, the industry and Government cannot work together to come up with a reasonable approach for solving the problem. They certainly have done so this time.

I pay tribute to the industry. They showed a great deal of initiative and intelligence and cooperation in coming to the committee and discussing with all members of the committee the problems and the kind of legislation that would be workable and practicable and would do the job.

We discussed the matter in great detail with the Associated Credit Bureau, the consumer groups, and with interested groups.

I think we have a bill that will work and do the job for the consumer and will protect the very important interests of a vital industry.

Mr. President, I compliment the senior Senator from Utah (Mr. BENNETT) and the able chairman of this committee (Mr. SPARKMAN) for their constructive cooperation on this legislation. The committee has reported a fair and workable bill and I recommend its enactment to the Senate.

Mr. JAVITS. Mr. President, will the Senator yield?

Mr. PROXMIRE. I yield.

Mr. JAVITS. Mr. President, I submitted some amendments which were referred to the committee, and I am glad to see that the committee has paid attention to these amendments, especially the one which relates to the ability of the consumer to present his side of the case. Much of the effect of these provisions have been added to the bill. I am troubled, however, by one aspect which I think is important.

Mr. PROXMIRE. Mr. President, before the Senator comes to that matter, I point out that the Senator from New York was very helpful to the committee.

The Senator from New York is a leading consumer's advocate. He is very expert in the matter. His advice and recommendations to the committee were very helpful.

Mr. JAVITS. Mr. President, I am very pleased that the Senator feels that way. When I was attorney general of New York, I had a great deal to do with consumer fraud. And my successor, Attorney General Lefkowitz, is considered to be very much of a leader in this field. I profited greatly from my consultations with him with respect to the questions which I will raise.

First, the Senator will recall that I suggested to the committee the possibility of granting authority to the attorney general of a State to seek a permanent injunction against a credit reporting agency or user of information which does not comply with the law. Could the Senator tell us what is the scheme of enforcement which commended itself to the committee which makes the committee feel that it was better to omit that authority in States' attorneys general?

Mr. PROXMIRE. The suggestion of the Senator from New York was discussed in some detail. It was felt that this could somewhat complicate the bill. There was a particular feeling that this ought to be as uniform nationally as possible because of the nature of the credit reporting industry, which crosses State lines so freely, so widely, and so regularly. So the enforcement was given to the Federal Trade Commission instead of the individual States' attorneys general.

Mr. JAVITS. The purpose of that, then, was uniformity of litigation and uniformity of decision?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. I think that is sound.

I would assume, however—and may the record clearly show—that it is intended that the attorneys general of the States are encouraged to carry on consumer protection activities, that it is the intention of Congress that they may be considered part of the enforcement mechanism by which this particular measure will operate, and that their complaint will be given very considerable weight by the enforcing agency.

Mr. PROXMIRE. By all means. And I am delighted that the Senator has emphasized this, because this is the type

Crane-Hirsch Exhibit 2, page 4 of 6

of legislation which can work effectively only if States' attorneys general, who are recognized so widely as the enforcing arm in the States, do feel that they have this responsibility and feel free to exercise it when called upon to do so.

Mr. JAVITS. So that in our legislative oversight, I hope very much that the Committee on Banking and Currency, which reported the bill, will have that in mind, so that some accounting might be asked of the attention paid by the Federal Trade Commission to the complaints of attorneys general.

Mr. PROXMIRE. I appreciate that very much. That is something that we will certainly watch and encourage.

Mr. JAVITS. And I will assume the same accounting will be taken of the other enforcement agencies within the bill?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. The other thing that puzzles me with a scheme of this character, and I realize that it is sort of webbed through the bill, is this: The scheme of operation which gives notice to the consumer, who is the subject of possibly arbitrary, erroneous, and malicious credit information, that there is something in the files about him or that something is being looked into which affects him, in order that he might head off, with his explanation or deletion at the earliest possible time the particular information about him which is arbitrary, erroneous, and malicious.

For example, I note that section 606(b), on page 14, line 10, which refers to this concept of notice deals only with an "investigative consumer report," defined as one dealing more with character and methods of living, and so forth, but does not deal with the credit worthiness of the consumer. Credit worthiness comes under another heading of "consumer report."

If the Senator will bear with me and look at the bottom of page 15, section 609, he will note the words "Every consumer reporting agency shall, upon request."

When I offered my amendments, I had hoped that the committee would get as near as possible to making it the responsibility of the credit reporting agency to notify the person, the subject of the report, as it began to prepare a report on him, so that he would know that he is being investigated and could begin at that particular moment to deal with anything that might be unearthed and written about him that would be very deleterious.

I am sure the Senator knows the normal processes of life. This concern does not involve General Motors or General Electric. It involves very ordinary people who might seek credit from a department store or a restaurant of any one of a dozen things of that character. Before he even knows that he is being looked into or that there is a credit report on him, he is characterized as a deadbeat, a drunkard, or a wife beater, and that is the end of that. He will never catch up with that. It is only then by the bill's provisions concerning credit worthiness, that he may be able to make a request to evaluate the information that characterized him in such a way.

I am stating it in the worst possible way, but I should like the Senator to explain how he feels—understanding that because this is his bill there may be many other considerations of which the Senator is aware—he is trying within reason to give the consumer a fair break on that equation.

Mr. PROXMIRE. As I drafted this bill originally, I provided that whenever adverse information is included in any file, the consumer would have to be notified, and I was strongly for that. This was discussed by the committee. It was discussed in the hearings at some length. We were finally convinced that this would involve so much expense and so much difficulty for the credit agencies that they had a legitimate complaint about it. Therefore, we took something which would be less satisfactory to the consumer—I would agree—but which would work in most cases; that is, whenever a consumer is turned down, he then would have the right to find out what is in his credit file and to have it corrected.

The Senator from New York is absolutely correct in his implications about inaccurate, untrue, or slanderous information in a file which many people might not know exists. But the theory is that until they are damaged in some way by an adverse reaction on employment, insurance, or credit, they do not have as much basis for correcting it.

Mr. JAVITS. How does the consumer get the reporting agency to backtrack with the company, for example, that denied him credit on the basis of an erroneous report? Does the bill make the credit agency correct its error, even though it is post facto?

Mr. PROXMIRE. They would be required to delete the information which is inaccurate. They would be required to notify the recipients of the credit report that it had been deleted and corrected.

Mr. JAVITS. That is very important. That is clear in the bill?

Mr. PROXMIRE. That is clear in the bill.

Mr. JAVITS. The Senator represents that to the Senate?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. They have to backtrack as far back as to the very people who denied the credit on the ground of an erroneous report?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. And they have to do that in writing?

Mr. PROXMIRE. The Senator is correct.

Mr. JAVITS. That is important, because the credit agency's value as an item of their good will, is their veracity. So that is a sanction, and it is intended to be?

Mr. PROXMIRE. It certainly is.

Mr. JAVITS. That is, a sanction on the individual reporting agency?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. Suppose the information is malicious. Is there anything that prevents the individual from seeking redress in a civil suit? I realize the good faith problem which is involved, but would the bill cut off the right to penalize the reporting agency in the event of malice?

Mr. PROXMIRE. If he feels it is ma-

licious. The reporting agency could still get a waiver in which it could not be held that it was malicious until he could prove it. The burden of proof would be on the complainant, on the consumer. But he can bring the suit.

Mr. JAVITS. There is nothing in the bill that exempts the agency from malicious conduct? There is some analogy here, of course, to the New York Times case in Mississippi.

Mr. PROXMIRE. That is correct.

Mr. JAVITS. I just want to be positive that we are not giving some kind of license to the reporting agency to which it is not entitled.

Mr. PROXMIRE. Let me read the section, so that we will be perfectly clear. Page 17, line 9, reads as follows:

(e) Except as provided in sections 616 and 617, no consumer shall have any claim against or bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 609, 610, or 615, except as to false information furnished with malice or willful intent to injure such consumer.

I would think that that exception clause would meet the point made by the Senator from New York.

Mr. JAVITS. So care has been taken to preserve the right of action for the consumer.

Mr. PROXMIRE. That provision was patterned after the New York State law.

Mr. JAVITS. Yes. Care has been taken to protect the right of action where it is premised on non-good-faith reporting.

Mr. PROXMIRE. The Senator is correct; malice.

Mr. JAVITS. Nothing in section 616 or section 617 negates that preservation of right in the consumer. Is that right?

Mr. PROXMIRE. No. That gives the consumer the right to file his complaint.

Mr. JAVITS. So that the civil liabilities of section 616 and section 617 do not prevent the consumer from suing and recovering, if he can prove that false information was taken or was furnished with malice or willful intent to injure him.

Mr. PROXMIRE. No. On page 23 there is spelled out how he can do it. It seems to me this would strengthen the consumer's position and it would not and does not intend to diminish it.

Mr. JAVITS. And certainly it is not intended to cut off his right of recovery, even without the limitation in section 616 and section 617, if he can prove what the Senator read, that it was false information furnished with malice or willful intent.

Mr. PROXMIRE. That is correct.

Mr. JAVITS. That is very important because I realize the reporting agencies get something out of this. They get a limitation of liability; the right to publish certain information, as in periodicals, not notifying the consumer until he is hurt.

Mr. PROXMIRE. That is the quid quo pro for full disclosure.

Mr. JAVITS. I understand. I have been in a few businesses myself. But when a really outrageous case is involved,

Crane-Hirsch Exhibit 2, page 5 of 6

we do not want to hobble the injured party at all; if anybody is maliciously harmed he would have recourse.

Mr. PROXMIRE. I thank the Senator for his help.

Mr. JAVITS. Mr. President, the Senator from Wisconsin, as often happens here, has done a monumental job of great importance to the lives of the rank and file of our people. I wanted to be sure these essential elements of fairness have been preserved.

Mr. PROXMIRE. I thank the Senator.

THE FAIR CREDIT REPORTING ACT—A GIANT STEP FORWARD IN INCREASED CONSUMER PROTECTION

Mr. WILLIAMS of New Jersey. Mr. President, as one of the original sponsors of the Fair Credit Reporting Act, I am most gratified that this legislation is now before the Senate. When enacted this bill will close what in my opinion has been an unfortunate gap in our Nation's consumer protection laws. It will prevent consumers from being unjustly damaged by inaccurate credit reports. At the same time it will also insure the individual's right to privacy in the field of credit reporting.

This legislation will not place undue burdens on legitimate credit bureaus. It will allow credit bureaus to continue the gathering and supplying of data which is essential for fair and just credit ratings.

This bill recognizes the vital role played by credit reporting agencies in our economy. No one disagrees with the premise that those who extend credit have a right to the facts needed in order to make sound decisions. On the other hand, the consumer has equal right to know why he is refused credit because of an adverse report. His right to correct inaccuracies and to submit explanatory material is also of the utmost importance. The right of rebuttal provided for in this legislation is an inherent one under our traditions of fairplay and jurisprudence. Presently, there are far too many cases where adverse credit reports cause irreparable harm to the individual without his being afforded the opportunity to answer the charges, correct inaccuracies or in some cases to even know that such a report has been issued. The Fair Credit Reporting Act will put an end to these unwarranted practices.

Under this bill credit reporting agencies are required to make full disclosure to the consumer of all of the information obtained. The consumer will then be given the opportunity to correct inaccurate or misleading data. The bill also requires that this information be kept confidential and used only for legitimate business purposes. The consumer is also given the right to be informed of investigations into his personal life.

While most credit bureaus already operate within the framework of this bill, the rapid expansion of the credit reporting industry, where today files are maintained on more than 110,000,000 individuals, coupled with an almost complete lack of State regulation has caused some problems to arise. Hearings held earlier this year before the Banking and Currency Committee showed that in some cases highly confidential and personal data had been disseminated as a result

of random telephone calls or letters. In these cases not even a cursory check was made on the individual making the request for the data or its ultimate use.

An even more striking example of the need for this legislation was presented on CBS television earlier this year. At that time a reporter for the network was able to obtain 10 out of 20 of the credit reports on individuals whom he selected at random from 20 credit bureaus. To make matters worse, the reporter obtained this information by claiming that he represented a completely fictitious company. I am sure all will agree that basic protections are necessary to preserve the rights of the individual in such instances.

The Fair Credit Reporting Act is a reasonable and sensible approach toward alleviating these problem areas. Its provisions will not hinder credit bureaus in the collection of legitimate data. The bill will, however, preserve the basic rights of the individual. It will allow the subject of an adverse credit report to be fully informed of the charges levied against him. When such charges are inaccurate, the right to explain or refute is also present. These rights are basic to our American heritage and must not be infringed upon. Finally, this legislation will help to preserve the individual's right to privacy, especially where highly personal information is involved.

These are the rights which the Fair Credit Reporting Act seeks to protect. Surely no one would deny these rights to any of our Nation's citizens or quarrel with the purpose of this most important consumer protection legislation.

Mr. President, I commend the Senator from Wisconsin for the long, difficult, most necessary work he has done in connection with the important legislation now before the Senate.

Mr. PROXMIRE. I thank the Senator from New Jersey. I know of no one who has worked harder, more consistently, or more effectively on behalf of the consumer than the Senator from New Jersey not only on this bill but in other bills before the Senate.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER FOR ADJOURNMENT

Mr. MANSFIELD. Mr. President, I ask unanimous consent that when the Senate completes its business today, it stand in adjournment until 12 o'clock noon tomorrow.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER FOR RECOGNITION OF SENATOR GRAVEL AT THE CONCLUSION OF MORNING BUSINESS TOMORROW

Mr. MANSFIELD. Mr. President, I ask unanimous consent that sometime at a

convenient point during the morning hour, or at the conclusion of morning business, the distinguished Senator from Alaska (Mr. GRAVEL) be allowed to proceed for not to exceed 30 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER OF BUSINESS

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. BENNETT. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT OF CONSUMER PROTECTION CREDIT PLAN

The Senate resumed the consideration of the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information.

Mr. BENNETT. Mr. President, I appreciate the courtesy of the Senate, and of my colleague from Wisconsin (Mr. PROXMIRE) in particular, in giving me this opportunity to participate in the presentation of the bill.

I am sorry I could not be on the floor during my colleague's discussion of it, but I am involved in a conference downstairs, and I hope that what I shall say will fit in with what has gone before, because obviously I am in no position to be sure.

Mr. President, I support this legislation, although I believe that the need for it has been greatly exaggerated.

The committee members and representatives of both the reporting agencies and the industries which they serve have worked hard to reach agreement on responsible legislation which would protect the legitimate interests of both consumers and industry. I believe that those representing the industries which will be covered by this legislation should be commended for their untiring efforts and their willingness to view not only their own interest but that of consumers whom they ultimately serve.

Of course, I realize that there are some segments of the industry which are disappointed, which feel that it does not adequately take care of their particular and perhaps different needs. But, with this bill, we are breaking new ground, and I am sure if time reveals that we have made mistakes, or we have overlooked situations, the committee can come back and remedy the deficiencies.

This bill covers all types of reports on consumers, even though one might be led to believe that it covers only credit reports. In addition to credit reports, reports are also made on individuals seeking employment and individuals seeking insurance. In fact, reports dealing with insurance and employment are necessarily more detailed in most instances than those on individuals seeking credit. Because of this additional detail, this legislation is more onerous on reporting