# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: Farmers Insurance Co., Inc., FCRA Litigation, | ) ) ) | Western Dist. Case No. CIV-03-158-F |
| | ) | MDL No. 1564 |
| Judge Friot | ) | |
| | ) ) | **This document relates to Corl, Watts & Mobbs** |

## ORDER

Before the court are Plaintiffs' Motion to Amend Class Definition (doc. no. 911) and Defendants' Motion to Amend the Class Definition (doc. no. 916). Upon due consideration of the parties' submissions, the court makes its determination.

Background

The court previously certified, pursuant to Rule 23, Fed. R. Civ. P., the following class:

> All individual consumers who renewed or purchased auto or homeowners insurance from Farmers Insurance Company, Inc., Mid-Century Insurance Company, Farmers Insurance Exchange, or Fire Insurance Exchange and did not receive the largest credit discount for such insurance based in whole or in part on information contained in a consumer report, and who received from Farmers Insurance Company, Inc., Mid-Century Insurance Company, Farmers Insurance Exchange, or Fire Insurance Exchange's form designated as follows:
>
> 25-7535 (version dated 6-00); or
>
> 25-7581 (version dated 9-00); or
>
> 25-7585 (version dated 9-00).
>
> Excluded from the class are: (1) Defendants and all directors, officers, agents and employees of Defendants; (2) claims by any person or entity

who timely opts out of this proceeding; (3) all currently serving federal district court judges, their current spouses, and all persons (and their current spouses) within the third degree of consanguinity to such federal district court judges and spouses; and (4) any person who has given a valid release concerning the claims asserted in this suit.

*See*, Order (doc. no. 568).

In light of Supreme Court's ruling in <u>Safeco Ins. Co. of America v. Burr</u>, 551 U.S. 47 (2007), the parties have filed motions requesting the court, pursuant to Rule 23(c)(1)(C), Fed. R. Civ. P., to amend the class definition. The parties agree the class, as currently defined, is over inclusive. The parties, however, disagree as to exactly who should be included in the class.

Defendants, in their motion, also seek to amend the class to include subclasses limited to the common issues of whether defendants took adverse action, whether defendants' written notice complied with the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m, and whether defendants willfully violated § 1681m. Defendants contend that the court should exclude from class-wide determination the issues of whether a class member received oral notice from his or her agent consistent with § 1681m and the amount of statutory damages under 15 U.S.C. § 1681n to be awarded to each class member in the event of a finding of willfulness.

<u>Discussion</u>

A. <u>FCRA</u>

The FCRA requires, among other things, that "any person [who] takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" must notify the affected consumer. 15 U.S.C. § 1681m(a). The notice to the affected consumer must point out the adverse action, explain how to reach the consumer reporting agency that reported on the consumer's credit, and tell the consumer that he can get a free copy of the report and

dispute its accuracy with the consumer reporting agency.  *Id*.  Adverse action taken by an insurer for purposes of notice under § 1681m is "a denial or cancellation of, <u>an increase in any charge for</u>, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, <u>any insurance, existing or applied for</u>, in connection with the underwriting of insurance."   15 U.S.C. § 1681a(k)(1)(B)(i) (emphasis added).

B.  <u>New-Business Insureds</u>

In <u>Safeco</u>, the Supreme Court concluded that the setting of initial rates charged for new insurance policies may be adverse actions.  The Court concluded that "an increase in any charge . . .  for any insurance, existing or applied for," § 1681a(k)(1)(B)(i), includes "a disadvantageous rate even with no prior dealing." <u>Safeco</u>, 551 U.S. at 63.    Although an initial rate offer can be an "adverse action," the notice called for under § 1681m(a) is required only when the adverse action is "based in whole or in part on" a credit report.  <u>Safeco</u>, 551 U.S. at 63.  The Supreme Court stated that in "common talk," the phrase "based on" indicates a but-for causal relationship and thus "a necessary logical condition."  *Id*.  The Supreme Court therefore concluded that "an increased rate is not 'based in whole or in part on' the credit report unless the report was a necessary condition for the increase."  *Id*.

The Supreme Court in <u>Safeco</u> also identified the benchmark or baseline for determining whether a first-time rate is a disadvantage increase.  The government and respondent-plaintiffs in <u>Safeco</u> had argued that the baseline "should be the rate that the applicant would have received with the best possible credit score."  <u>Safeco</u>, 551 U.S. at 65.  The petitioner-defendant insurer, on the other hand, argued that the baseline "is what the applicant would have had if the company had not taken his credit

score into account (the 'neutral score' rate [the insurer] used in [the insured's] case)."[1] *Id*. The Court concluded that the petitioner-defendant insurer had the better position. The Court reasoned that the "increase" baseline was more consistent with the understanding of causation it had discussed, "which requires notice under § 1681m(a) only when the effect of the credit report on the initial rate offered is necessary to put the consumer in a worse position than other relevant facts would have decreed anyway." *Id*. at 65. The Court therefore concluded that the baseline for determining whether a first-time rate is a "disadvantage" increase is the rate the applicant would have had if the company had not taken his credit score into account (the "neutral score" rate) rather than the rate the applicant would have received with the best possible credit score. *Id*. at 65. Consequently, a rate initially offered for new insurance is an "increase" calling for notice under § 1681m(a) if it exceeds the neutral score rate. *Id*. at 65-66.

In their motion, defendants initially contend that the current class definition is overbroad because it includes new-business insureds who are not entitled to statutory damages as a matter of law. Defendants assert that in <u>Safeco</u>, the Supreme Court held that an insurer did not willfully violate § 1681m(a) of the FCRA with respect to new-business insureds, as a matter of law, even when it failed to send any FCRA notices to new-business insureds prior to the <u>Safeco</u> ruling. Defendants assert that the insurer in <u>Safeco</u> sent no FCRA notice to its new-business insureds, no matter what amount it charged them based on consumer credit report information.

---

[1] In <u>Safeco</u>, the Supreme Court had explained that the defendant insurer had devised a method to "neutralize" an applicant's credit score. In determining whether an adverse action notice should be sent to the applicant, the defendant insurer compared the applicant's company and tier placement with the company and tier placement the applicant would have been assigned with a "neutral" credit score, "that is one calculated without reliance on credit history." <u>Safeco</u>, 551 U.S. at 54. If using the neutral credit score would have put the applicant in a lower priced tier or company, an adverse action notice was sent to the applicant.

Defendants assert that in light of <u>Safeco</u>'s holding, it would be futile to include new-business insureds in the present class definition because defendants, like the insurer in <u>Safeco,</u> could not have willfully violated the FCRA with respect to new-business insureds.  Defendants contend that they gave a FCRA notice to each new-business insured who did not receive the largest possible FARA or FPRA discount.  The insurer in <u>Safeco,</u> on the other hand, sent no notice to any of its new-business insureds.  Defendants point out that the court in <u>Ashby v. Farmers Ins. Co. of Oregon,</u> 565 F. Supp.2d 1188 (D. Or. 2008), reached the same conclusion.

This issue was previously raised by defendants in their motion for summary judgment.  The court, in a separate order, has rejected defendants' argument.  The court concludes that defendants are not, as a matter of law, absolved from liability to new-business insureds based upon the holding of <u>Safeco</u> or the ruling of <u>Ashby</u>.  The court concludes that the claims of plaintiffs based upon new-business premiums may proceed as alleged.  The class definition shall include new-business insureds.

In their motion, defendants alternatively argue that even if the court includes new-business insureds in the class definition, the current class definition is overbroad because it includes all new-business insureds who did not receive the best possible premium charge (the highest FARA or FPRA discount) due to information in their credit report.  Defendants assert that under <u>Safeco,</u> only new-business insureds who where charged more than they would have been charged had defendants not considered their credit report information were entitled to notice under § 1681m(a).  Defendants contend that this is determined in defendants' rating system by comparing a new-business insured's premium charge using his or her credit insurance score and corresponding FARA and FPRA  discount to the premium the insured would have been charged had defendants been charged using FARA or FPRA code "N" and its associated discount factor.  If the new-business insured's premium was equal to or

5

lower than the rate he or she would have been charged using the "N" factor, defendants did not take adverse action. Conversely, if the new-business insured's premium was higher than the premium he or she would have been charged if the "N" factor was used in the calculation, then defendants took adverse action in charging that first premium.

In their motion, plaintiffs contend that the "neutral score" within the meaning of Safeco is the premium weighted average FARA or FPRA factor. Plaintiffs contend that this is the truly neutral score because if every policyholder had that specific factor, it would result in the same overall premium to defendants. Plaintiffs maintain that the "N" factor is not the neutral score. Plaintiffs argue that it is not a factor which does not take credit history into account. According to plaintiffs, defendants assigned the "N" code a factor of 1.0. In doing so, plaintiffs contend that defendants treated the "N" code like the "Z" code. Individuals with the "Z" code, plaintiffs assert, had the worst credit histories and were charged the highest premiums. Although defendants later adjusted the "N" factor, the factor was not adjusted above the average FARA or FPRA factor. Plaintiffs argue that if the court were to use the "N" factor as the baseline for new-business insureds, few, if any, new-business insureds would be entitled to receive an FCRA notice.

The court has previously addressed this issue in addressing defendants' motion for summary judgment. The court has concluded that the premium weighted average FARA and FPRA factors, rather than the "N" factor, is more in line with Safeco as the benchmark for determining whether a first-time rate is a disadvantageous increase. Therefore, if the new-business insured's premium was equal to or lower than the rate he or she would have been charged using the premium weighted average FARA or FPRA factor, defendants did not take adverse action and no notice was required under § 1681m(a). Conversely, if the new-business insured's premium was higher than the

premium he or she would have been charged if the premium weighted average FARA or FPRA factor was used in the calculation, then defendants took adverse action in charging that first premium and the new-business insured was entitled to notice under § 1681m(a).

C.  Renewal Insureds

In Safeco, the Supreme Court concluded that after the initial dealing between the consumer and the insurer, "the baseline for 'increase' is the previous rate or charge, not the 'neutral' baseline that applies at the start." Safeco, 551 U.S. at 66.

In their motion, defendants contend that the current class definition is overbroad because it includes renewal insureds for whom no adverse action was taken. Defendants contend that under Safeco, two requirements must be met for a renewal insurance premium charge to constitute adverse action.  These requirements are: (1) the premium charge must increase over the immediately previous premium; and (2) the premium increase was caused by the insured's credit-based insurance score. Defendants contend that the current class definition, however, includes all insureds who received less than the largest FARA or FPRA discount, even if their premiums decreased or were unchanged at renewal.  In addition, defendants contend that the class definition includes insureds whose premium increases were caused by factors other than their FARA or FPRA discount.  Defendants assert that their proposed class definition begins with Safeco's requirement that adverse action in the renewal context requires an actual premium increase over a prior premium charge and excludes those insureds whose premium increases were caused by noncredit factors.

To satisfy the two-part test, defendants assert that it is necessary to determine whether a renewal premium charge actually increased over a previous premium and to ascertain whether that premium increase was caused by the insured's FARA or FPRA discount factor or some other cause.  Defendants contend that as applied to

their rating system, the causation analysis turns on whether the renewal premium charge was the first renewal premium involving the application of a FARA or FPRA factor (the "transition renewal"), or a premium increase over a prior renewal premium that was set using a FARA or FPRA factor (the "subsequent renewal").  According to defendants, at transition renewal, an insured's premium increase caused, in whole or in part, by a base-rate offset in excess of the insured's FARA or FPRA discount may be considered a premium increase caused by the FARA or FPRA factor.

As to subsequent renewals, defendants contend that in order for a renewal premium increase to have been caused by an insured's FARA or FPRA factor, three conditions must have been met: (1) the insured's premium must have increased over the prior renewal premium charge; (2) the increase must have been accompanied by a worsening of the insured's credit-based insurance score; and (3) the lower credit-based insurance score must have caused a negative change in the insured's FARA or FPRA factor discount.

Plaintiffs, in their motion, agree that under Safeco, only policyholders, on renewal, who saw their premiums increase are entitled to adverse action notice. Plaintiffs, however, disagree that the premium increase must be caused by the FARA or FPRA factor.  Instead they argue that the increase must only be "based . . . on" information in a credit report.  Plaintiffs contend that determining whether an increase in premium was based on information in a credit report  is simple.  Plaintiffs assert that under defendants' system, a policyholder with a lower FARA or FPRA factor will pay a lower premium with all other things being equal.  Therefore, plaintiffs argue that if a policyholder renews his or her policy and the premium is calculated using a FARA or FPRA factor other than the most favorable factor, any increase in premium will necessarily be based at least in part on information contained in his or her credit report.  Stated differently, had the policyholder's credit report been more favorable,

defendants would not have increased the premium or at least the premium would have been less than it was.

Plaintiffs believe that their test not only comports with the purpose of the FCRA adverse action notice requirement but is required by Safeco. Nevertheless, if the court accepts defendants' argument that a renewal increase must be "caused by the insureds' FARA or FPRA factor" to trigger an adverse action notice, plaintiffs believe that defendants have articulated a proper test for "transition renewal" policyholders. Plaintiffs do not agree, though, with defendants' test for subsequent renewals. Plaintiffs contend that adverse action notices should be sent to any subsequent renewal customer with an increase in premium that was calculated using (a) a FARA or FPRA factor higher than that used in the prior policy, or (b) a FARA or FPRA factor that is worse relative to the neutral FARA or FPRA factor than that used in the prior policy. Using these tests, plaintiffs assert, will ensure that adverse action notices are sent whenever the impact of defendants' credit scoring program on a policyholder's premium changes for the worse from one policy to the next.

The court has previously addressed the issues in regard to renewal insureds in addressing defendants' motion for summary judgment. The court has concluded that defendants' positions as to renewal insureds are more consistent with the teaching of Safeco. The court has concluded that the premium increase at transition renewal must bear a but-for causal relationship to the insured's credit report. The increase must be "caused by" the FARA or FPRA factor. Therefore, as articulated by defendants' expert, "an insured's premium increase at transition renewal caused by a base rate offset in excess of the insured's FARA or FPRA discount may be considered a premium increase caused by the FARA or FPRA factor." Expressed mathematically, the inverse of the policyholder's FARA or FPRA factor (1.0 divided by the policyholder's FARA or FPRA factor) is less than the base rate offset (1.0 plus the

base rate offset percentage) applied at implementation of FARA or FPRA in a given state.  Declaration of John P. Tierney in Support of Defendants' Motion to Amend the Class Definition (doc. no. 917), ¶ 13.

The court has also concluded that as to subsequent renewals, three conditions must be met for a renewal premium increase to have been caused by an insured's FARA or FPRA factor: (1) the insured's premium must have increased over the prior renewal premium charge; (2) the increase must have been accompanied by a worsening of the insured's credit-based insurance score; and (3) the lower credit-based insurance score must have caused a negative change in the insured's FARA or FPRA factor discount.  In other words the renewal premium increase at subsequent renewal must be caused, in whole or in part, by a negative change in the policyholder's credit-based insurance score that resulted in the application of a lower FARA or FPRA factor discount than was used to rate the policy in the immediately prior policy period.

D.  <u>Statute of Limitations</u>

In their motion, defendants contend that the current class definition is significantly overbroad because it includes claims that are time-barred as to specific entities, and time-barred because the transactions at issue occurred outside the applicable statute of limitations period.  Defendants assert that at the time of the filing of the original <u>Corl</u>, <u>Watts</u> and <u>Mobbs</u> complaints, and at the time of the conduct complained of, the FCRA had a two-year statute of limitations.  *See*, 15 U.S.C. § 1681p (2002) ("An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court . . . within two years from the date of which the liability arises . . . ")[2]  Relying upon the previous court's ruling,

---

[2] The FCRA statute of limitations was amended, effective March 31, 2004.  *See*, Pub. L. No. 108-159, § 3, 117 Stat. 1952 (2003).

In Farmers Ins. Co., Inc. FCRA Litig., 2007 WL 4215833 at *6 (W.D. Okla. Nov. 29, 2007), defendants contend that a claim under § 1681m(a) accrued when defendants billed insureds for the higher premium that constituted an adverse action without providing adequate notice under § 1681m.

Defendants state that the current class definition is based on a putative class alleged in the Consolidated and Amended Class Action Complaint (doc. no. 493) filed by plaintiffs on January 24, 2005. This class is defined as all insureds of Farmers Insurance Company, Inc. ("FICI"), Farmers Insurance Exchange (" FIE"), Fire Insurance Exchange ("FIRE") and Mid-Century Insurance Company ("Mid-Century") who did not receive the lowest possible premium based on consumer report information and who received one of defendants' FCRA notices used from the implementation of FARA and FPRA to the end of September 2002. Defendants contend that this class definition is substantially broader than the plaintiff classes alleged in the original Corl, Watts and Mobbs complaints. To the extent that the Consolidated and Amended Class Action Complaint asserts claims on behalf of putative class members not alleged within the original Corl, Watts and Mobbs complaints, defendants contend that those claims are time-barred.

Defendants assert that the Corl, Watts and Mobbs complaint did not assert claims on behalf of Mid-Century homeowners insurance policyholders. Defendants therefore contend that claims alleged on behalf of Mid-Century homeowners insurance policyholders in the Consolidated and Amended Class Action Complaint are time-barred. Likewise, defendants argue that the Corl complaint asserted claims only on behalf of FICI automobile insurance policyholders, but alleged no claims on behalf of FIE, FIRE or Mid-Century automobile insurance policyholders. Accordingly, defendants contend that the claims of FIE, FIRE and Mid-Century automobile insurance policyholders are also time-barred.

Defendants assert that the current class definition is also overbroad because it defines the class period with reference to three of defendants' FCRA notices that were used between implementation of FARA (beginning in 2000) and FPRA (beginning in 2001) and the end of September 2002 when the notices were replaced.  Defendants assert that a significant portion of this period, however, was more than two years before the original Corl, Watts and Mobbs complaints were filed.  Accordingly, defendants contend that the class definition includes only those FIE, FIRE and non-Oklahoma FICI homeowners insurance policyholders for whom adverse action was taken on or after February 12, 2001, Oklahoma FICI homeowners insurance policyholders for whom adverse action was taken on or after February 6, 2001 and FICI automobile insurance policyholders for whom adverse action was taken on or after June 13, 2001, through the end of the class period.

Plaintiffs, in response, contend that the class definition does not contain any time-barred claims.  Plaintiffs assert that in analyzing the limitations issue, defendants have looked solely to the filing dates for the Corl, Watts and Mobbs complaints. Plaintiffs argue that in doing so, defendants have ignored the effect of the class action tolling doctrine of American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974), as well as the procedural history of the various FCRA complaints that have been filed against defendants.  Plaintiffs contend that the filing of the Ashby class action operated to toll the statute of limitations as to all claims against defendant, Farmers Group Inc. ("FGI"), arising out of adverse action notices from any affiliated company (i.e. FICI, FIE, FIRE and Mid-Century) for which it acted as attorney-in-fact or as management company beginning on September 28, 2001.  Plaintiffs thus assert that the claims against FGI reach back to September 28, 1999.  In addition, plaintiffs contend that the filing of the Clark class action on July 15, 2002 tolled the statute of limitations as to all claims against FGI arising out of adverse action notices from FIE, FICI, and Mid-

12

Century and as to claims against FIE itself.  Thus, plaintiffs assert that the claims against FGI and FIE reach back to July 15, 2000 based on the <u>Clark</u> action.  Plaintiffs further contend that the filing of the <u>Ross</u> class action on October 27, 2003 tolled the statute of limitations as to claims against Mid-Century.  Plaintiffs therefore assert that the claims against Mid-Century reach back to October 21, 2001.  Finally, plaintiffs contend that based upon the filing of the <u>Corl</u>, <u>Watts</u> and <u>Mobbs</u> complaints, the claims against FICI by Oklahoma homeowners insurance policyholders reach back to February 6, 2001, the claims against FICI by non-Oklahoma homeowners insurance policyholders reach back to February 12, 2001 and the claims against FICI by automobile policyholders reach back to June 1, 2001.

Plaintiffs contend that it is plain from the foregoing sequence that all class members in the current class definition have a timely claim.  Although claims against specific insuring companies may depend on the dates when those companies were specifically named in a complaint, plaintiffs contend that every class member has a claim against FGI.  Plaintiffs therefore contend that defendants' statute of limitations argument should be rejected.

The court has previously addressed the statute of limitations arguments in ruling on defendants' motion for summary judgment.  The court has concluded that the tolling doctrine of <u>American Pipe</u> applies and that the applicable limitations period commenced against FGI and the other defendants as asserted by plaintiffs.  The court has concluded that plaintiffs and the class members have claims against FGI.  As every plaintiff and putative class member has a claim against FGI, the court finds that the class definition need not be amended based upon the two-year statute of limitations.

E.  Certification as to Predominantly Common Issues

In opposing plaintiffs' original motion for class certification, defendants argued that the evidence relating to insurance agents orally providing notice of the adverse action and the amount of statutory damages to be awarded to each class member in the event of a willful violation of the FCRA rendered class certification inappropriate on predominance grounds.  The court disagreed but, according to defendants, the court reserved the right to alter or amend its decision as the record further developed in the case.  Defendants, in their motion, now request that the court exclude the issue of oral notice and the amount of statutory damages from its class certification order and limit certification of the class to the common issues of whether defendants' written FCRA notice complied with § 1681m(a) and whether that written notice constitutes a willful violation of the FCRA within the meaning of <u>Safeco</u>.  Defendants contend that the issues relating to oral notice and statutory damages are highly particularized and that individual factual determinations relating to these issues should not be resolved on a class-wide basis.

Defendants assert that in its certification order, the court refused to deny class certification on the basis of evidence that agents provided oral notice of adverse action to class members for two reasons: (1) defendants had not cited any authority that a deficient written FCRA notice could be supplemented orally by insurance agents; and (2) there was no evidence that such communications occurred during the class period. Defendants contend that the plain reading of § 1681m indicates that defendants' agents' communication of the notice of the adverse action is relevant to whether any class member received or did not receive notice of the information disclosures required by § 1681m(a).  In addition, defendants contend that the factual record shows that oral representations made by defendants' agents occurred during the class period and varied materially from class member to class member.

14

On the issue of oral notice, defendants contend that Congress stated three times in § 1681m(a) that the information disclosures required by that section could be communicated orally to insureds.  Defendants contend that in so doing, Congress did not establish any requirement that the information disclosures be communicated at the same time or by the same medium.  Defendants assert that by the language used in § 1681m(a), Congress intended to authorize users of consumer report information to satisfy the notice obligations in the statute in one or more separate communications, using one or more separate means of communication.  According to defendants, had Congress intended to preclude separate communication of information required by § 1681m(a) or to require that it all be expressed in one form or medium, it would have so stated.  Defendants contend that Congress logically could have contemplated that a mixture of oral and written communication would have effectively conveyed to insureds the effect of credit reports on their premiums.  Defendants also contend that Congress could have expected that an insurer's agent would orally explain the impact of the insured's credit report on his or her premium charge and then also provide the insured with a form indicating the source of the credit report, the insured's right to obtain a copy of the report and to challenge the accuracy of its contents.  According to defendants, communication of the required information in this manner may encourage insureds to pay more attention to the information set forth in § 1681m(a) than they would if they received a written notice alone.

Defendants contend that there is evidence in the record that insurance agents told insureds that their premiums were impacted adversely due to information in their credit reports.  Defendants contend that plaintiff David Watts' agent testified that he regularly provided notice to new-business insureds of how their credit scores were impacting their premium charges.  Defendants contend that premium quotes were given immediately after the credit score was determined and the class members were

15

told, before receiving any written notice, that they were not receiving the best discount available due to their credit.  In addition, defendants contend that renewal insured class members were orally informed that their premiums were increasing because of, or being adversely impacted by, their credit-based insurance scores.  Defendants point out that both plaintiffs Nyle Cearlock and David Watts were told what their scores were (and that they were not the best scores possible), after which they obtained their credit reports, corrected errors and got refunds from defendants.  Further, defendants assert that the insurance agent for plaintiff Arlene Hancock initiated conversations with his renewing insureds to discuss how their credit-based insurance scores were impacting their premiums.  According to defendants, the agent attempted to contact his customers in advance of their first homeowners policy renewal using FPRA to discuss the impact of FPRA on their premium.

Defendants contend that class members who received oral notice from their insurance agents that their credit-based scores negatively impacted their premium charges received notice of the adverse action under FCRA and that they are not entitled to statutory damages in this case.  To account for this evidence, defendants urge the court to limit class certification to issues concerning the defendants' written notice and to exclude the oral notice issues from its certification order.

As for statutory damages, defendants argue that this issue is not appropriate for class certification because this issue, like the oral notice issue, turns on individualized facts and circumstances.  Defendants acknowledge that in granting class certification, the court held that the recovery of statutory damages did not require proof of injury or harm.  Even if the court were correct, defendants argue, individualized facts and circumstances are nonetheless relevant to the amount of statutory damages (the range being $100 to $1,000) which may be awarded to plaintiffs.  Defendants contend that the statutory damages are compensatory rather than punitive.  Consequently,

16

defendants contend that an award of statutory damages turns on compensatory factors. Defendants contend that these compensatory factors are individual to each class member and that without evidence relating to these factors, the factfinder cannot award statutory damages in excess of $100 for a willful violation of § 1681m(a). Defendants argue that any award in excess of $100, without consideration of the compensatory factors, would be wholly arbitrary. Because individual circumstances are relevant in determining the amount of a statutory damages award, defendants contend that the issue of statutory damages is not properly adjudicated on a class-wide basis.

The court declines to limit certification of the class to the common issues of whether defendants took adverse action, whether defendants' written FCRA notice complied with § 1681m(a) and whether that written notice constitutes a willful violation of the FCRA within the meaning of Safeco. The court concludes that defendants have not sufficiently shown that evidence exists that defendants complied with § 1681m(a) by providing oral notice of the adverse action through its insurance agents.

As pointed out by plaintiffs, defendants have admitted that their method to disseminate the notice of adverse action was through a "computer system . . . programmed to automatically send a FCRA notice to any insured with credit history whose credit information is reviewed and who does not receive the highest premium discount." *See*, Defendants' Opposition to Plaintiffs' Motion for Class Certification (doc. no. 531), at 15-16. There is no evidence in the record that defendants were relying upon their insurance agents to provide additional information to their new business insureds or policyholders to supplement any written notice sent pursuant to § 1681m(a). Moreover, plaintiffs have cited evidence that defendants told their agents to provide the written notice of adverse action, or in instances of oral notice: "you

17

must read the wording in the notice." *See*, "Farmers Auto Risk Assessment and FCRA– Changing the way we do business,"   Ex. PP to Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Class Certification (doc. no. 546).

Defendants rely upon evidence concerning conversations between plaintiffs Nyle Cearlock and David Watts and their insurance agents to show that renewal insured class members were orally informed of their premiums increasing because of their credit-based insurance scores.  These conversations, however, were instigated at the instance of plaintiffs and not the insurance agents.  The court, like the court in Drury v. TNT Holland Motor Express, Inc., 885 F. Supp. 161 (W.D. Mich. 1994), concludes that defendants cannot escape a violation of the FCRA simply because plaintiffs Cearlock and Watts "had the intelligence and assertiveness to get to the bottom of what happened." *Id*. at 165.

Defendants also rely on evidence that plaintiff Arlene Hancock's insurance agent, Allen Kerr, testified that he initiated conversations with his renewing insureds to discuss how their credit-based insurance scores were affecting their premiums. Although Mr. Kerr testified that he initiated a "discussion" of credit scoring with any customer that "didn't ask [him] about it," the testimony does not reveal that he actually contacted the customer first to advise him that his automobile or homeowners insurance premium had increased because of his or her credit-based insurance score. *See*, Ex. 16 to Declaration of Timothy W. Snider in Support of Defendants' Motion to Amend Class Definition (doc. no. 918), p. 88.  Defendants, however, also rely on a declaration of Mr. Kerr wherein he testified that he attempted to contact his customers in advance of their first homeowners policy renewal using FPRA to discuss the impact of FPRA on their premiums. *See*, Declaration of Allen Kerr in Support of Farmers' Opposition to Motion for Class Certification, (doc. no. 536).  But, in his deposition, when asked if he had attempted to contact every one of his customers to

explain that their credit information was being used to determine their insurance premiums, he replied "No."   Ex. 6 to Plaintiffs' Response to Defendants' Memorandum in Support of Defendants' Motion to Bifurcate Proceedings (doc. no. 696), pp. 89-90.   He testified that if a customer would ask him about the credit scoring, he would discuss it with the customer and that is what happened with plaintiff Hancock. *Id*.  The court concludes that the testimony of Mr. Kerr does not establish, with anything approaching a degree of certainty that is satisfactory for present purposes, that renewal insureds were provided oral notice of the adverse action pursuant to § 1681m(a).

As to new-business class member insureds, defendants rely upon the deposition testimony of plaintiff David Watts' insurance agent, Phillip Smith, to show that new-business insureds were informed of how their credit scores were affecting their premiums.  The court, however, concludes that Mr. Smith's testimony is insufficient to show that new-business insureds were given oral notice of the adverse action.   In his deposition, Mr. Smith testified as follows:

> A.   What I tell them is -- normally in this process I'm taking information down.   I get their Social Security numbers.  Normally they ask me -- you know, "I don't give it to everybody."   I say, "Well, we need this for our underwriting process and they're going to double check -- they're going to look at your credit rating -- credit score and it has -- it has to do with the rate that you will receive."
>
> Q.  Okay.  So you tell them that on the front end; that the company is going to go out and is going to look at their credit information?
>
> A.  Correct.

                              * * * *

Q.  And do you tell them whether it will be a discount or a surcharge?

A.  We look at scores and discuss with them A's to Z's, wherever they are, and tell them that -- you know, "Your credit score is not giving you the best rate that we could get."  Yes sir, we do that.  We talk to them about those credit scores and how they affect their rate.

Q.  Do you do that in the initial meeting or when they call you back after they get one of these notices?

A.  I have to pull up a credit score to give someone a rate.

Q.  Yes.

A.  And it's my normal practice when I see that credit score we talk to them about it.

Q.  Okay.  You talk to them about it right then?

A.  Not 100% of the time.  About what is the effect of the credit score.  I know I tell them that the credit scoring will be used.

* * * *

Q.  Okay.  Here's how I understand the process works with a lot of insurance agents.  And I want to understand your particular practice as well.

For purposes of what a lot of insurance agents do, they get all this personal information and they give somebody a preliminary quote that day.  Say your premium will be X, Y or Z.

A.  Uh-huh.

Q.  That person leaves.  The company does its underwriting and makes a determination as to what the – what company is – what particular insurance company is actually going to

write the policy and then what the particular premium is
going to be; correct?

MR. SNIDER: Object to form.

WITNESS: I just give a quote.  That's all I can do.

BY MR. WEBER:

Q.  Okay.  You give a quote on the front end, but it's not
binding on the company, correct?

A.  Correct.  The risk is bound if I bind it, but the price is
not bound.

Q.  All right.  And a couple of things could happen after
you give a quote.  As underwriting progresses and is
completed on that particular applicant, they could end up in
a different company than you quoted them; correct?

A.  They could.

Q.  And they could end up with a different premium than
you quoted them, correct?

A.  That's correct.

Ex. B to Declaration of Timothy W. Snider in Support of Defendant's Reply in
Support of Motion to Bifurcate (doc. no. 701), pp. 13, 19-21.  Although Mr. Smith
indicated in his deposition  that it was his normal practice to talk with the customer
about the credit score, he also indicated that he did not in every instance talk to the
customer about the "effect of the credit score."  In addition, Mr. Smith does not reveal
whether any of his conversations were with any plaintiffs or putative class members
and  whether  the  conversations  occurred  during  the  proposed  class  period.
Furthermore, Mr. Smith's testimony reveals that at the time of his conversation with

the new-business insured, he only gave a premium quote, which was not binding on the company. The new-business insured could end up with a different company or a different premium than quoted. Adverse action therefore had not yet occurred because defendants had not made a final premium determination. Consequently, the court concludes that Mr. Smith's testimony is insufficient to establish that insurance agents gave oral notice of the adverse action so as to comply with § 1681m(a).

In sum, the court concludes that the evidence proffered by defendants is not sufficient to suggest that the court should limit certification of the class to the issues of adverse action, adequacy of written notice and willfulness, carving out the issue relating to oral notice of adverse action.

The court also declines to exclude statutory damages from class certification. The court has previously concluded that the recovery of statutory damages under the FCRA is not dependent on proof of injury or harm. *See*, In re Farmers Ins. Co., Inc., FCRA Litigation, 2006 WL 1042450 at 9. Therefore, plaintiffs are not required to present individualized proof of injury from each class member to recover statutory damages. As did the court in Ashby, the court concludes that the factor most germane to the amount of a statutory damages award to class members is the "jury's perception of the importance, and hence the value, of the rights and protections conferred on the consuming public by FCRA's adverse-action notice requirements." Ashby v. Farmers Insurance Company of Oregon, 592 F. Supp. 2d 1307, 1318 (D. Or. 2008). In addition, the court concludes that "[a]ny individualized harm to each class member is irrelevant because none of the class members is seeking actual damages." *Id*. The court concludes that a reasonable jury should be able to determine an appropriate amount of damages within the statutory range – subject always to the court's exercise of its post-judgment responsibilities, as has been noted in the order, of even date with this order, with respect to the motions for summary judgment. The court therefore

concludes that the issue of statutory damages should not be excluded from class certification.

F. Subclasses

Defendants request the court to divide the class into four subclasses. According to defendants, evidentiary differences on the question of willfulness present significant problems with respect to adjudication on a class-wide basis. Defendants contend that there are significant differences in the evidence relevant to the willfulness determination with respect to class members for whom adverse action was taken early in the class period and class members for whom adverse action was taken late in the class period. Defendants assert that when they decided to use the challenged FCRA notices upon implementation of their FARA program, there was no case law or clear administrative guidance concerning the content required to satisfy § 1681m(a), and the legal advice they received from Morrison & Foerster indicated that their FCRA notices complied with the FCRA. However, defendants assert that on February 28, 2002, Judge Brown orally ruled in the Ashby class action that the FCRA required defendants to have communicated that the action they took was in fact adverse. In light of Judge Brown's ruling, Morrison & Foerster advised defendants to change the FCRA notices to communicate that the decision based on consumer report information was "unfavorable" to the policyholder. Subsequently, defendants revised its FCRA notices and the class period ended.

Defendants therefore contend that February 28, 2002 is the clear demarcation point in the class period as to willfulness. Defendants assert that whether they acted willfully in the earliest part of the class period is a different question from whether defendants acted willfully after February 28, 2002. Defendants point out that plaintiffs moved for partial summary judgment on the issue of willfulness for class members for whom adverse action was taken after April 2002 and before the notice

was revised.  To account for the differences in the evidence relating to willfulness, defendants urge the court to create the four proposed subclasses (two relating to automobile insureds and two relating to homeowners insureds), separating the class members according to specific time periods within the overall class period.

Plaintiffs, in response, contend that subclasses are not appropriate or necessary. According to plaintiffs, subclasses are necessary when there are differences in the positions of class members and these differences require separate representatives and separate counsel.  Plaintiffs assert that the usual situation for subclasses is when the class is found to have members whose interests are divergent or antagonistic. Plaintiffs point out that defendants, in their motion, do not show any actual intra-class conflict or antagonism between the various class members.  Plaintiffs also assert that defendants have not articulated any diverging positions of class members that would require separate representatives or counsel.  Plaintiffs contend that the sole basis for defendants' subclass argument is the fact that the <u>Ashby</u> court ruled on February 28, 2002 that defendants' notices did not comply with the FCRA.  While plaintiffs appreciate defendants' characterization of February 28, 2002 as the "clear demarcation point in the class period on willfulness," plaintiffs argue that defendants have not conceded that their conduct was willful as of February 28, 2002 or at any time. Plaintiffs contend that the demarcation point is the moment defendants implemented their FARA and FPRA programs in 2000 and ignored the plain and unambiguous language of § 1681m(a).  Plaintiffs assert that because they contend that defendants have been willfully violating the FCRA since at least 2000 and defendants contend that they have not been willfully violating the FCRA, the trier of fact must determine when defendants' willful violation began.  Plaintiffs argue that by proposing February 28, 2002 as the "clear demarcation point," defendants are asking for a class

24

definition that prejudges the weight of the evidence – which plaintiffs say is not an appropriate basis for establishing subclasses.

The court is not convinced that subclasses are appropriate.  The court agrees with plaintiffs that defendants are effectively seeking a class definition that prejudges the weight of the evidence.  The court declines to craft subclasses on the basis of a finding that February 28, 2002 is the "clear demarcation point" in regard to willfulness.  That is a matter that will likely be fair game for argument at trial, but the record in this case falls short of showing a serious cleavage in the proposed class on the basis of whether the notice was issues before or after February 28, 2002.  The court also declines to make a finding that "significant" evidentiary problems exist if the class is not divided into subclasses.  The court is not satisfied that the evidentiary differences on the issue of willfulness is such to necessitate subclasses.

Conclusion

Based upon the foregoing, the court **GRANTS** Plaintiffs' Motion to Amend Class Definition (doc. no. 911) and Defendants' Motion to Amend the Class Definition (doc. no. 916) to the extent herein stated.  The amended class definition is as follows:

> (1)   All persons who purchased a new policy of automobile and/or homeowners insurance from Farmers Insurance Company, Inc., Mid-Century Insurance Company, Farmers Insurance Exchange, or Fire Insurance Exchange and the premium charged for such policy was calculated using a FARA or FPRA factor greater than the weighted average FARA or FPRA factor, and

> (2)   All persons who renewed a policy of automobile and/or homeowners insurance from Farmers Insurance Company, Inc., Mid-Century Insurance Company, Farmers Insurance Exchange, or Fire

Insurance Exchange and the premium charged for such policy was greater than the premium charged for the immediately prior policy period and for whom one or more of the following occurred:

(a) the first time a Farmers Auto Risk Assessment ("FARA") factor was applied to the policyholder's policy (the "transition renewal"), the inverse of the policyholder's FARA factor (1.0 divided by the policyholder's FARA factor) is less than the base rate offset (1.0 plus the base rate offset percentage) applied at implementation; and/or

(b) the renewal premium increase subsequent to transition renewal (the "subsequent renewal") was caused, in whole or in part, by a negative change in the policyholder's credit-based insurance score that resulted in application of a lower FARA factor discount than was used to rate the policy on the immediately prior policy period, and

who received a form designated as follows:

25-7535 (version dated 6-00); or

25-7581 (version dated 9-00); or

25-7585 (version dated 9-00).

Excluded from the class are: (1) defendants and all directors, officers, agents and employees of defendants; (2) claims by any person or entity who timely opts out of this proceeding; (3) all currently serving federal district court judges, their current spouses, and all persons (and their current spouses) within the third degree of consanguinity to such federal district court judges and spouses; and (4) any

person who has given a valid release concerning the claims asserted in this suit.

DATED September 20, 2010.


_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


Farmers MDL p168.wpd